54 Cal.App.4th 1387 (1997)
In re BRANDON M., a Person Coming Under the Juvenile Court Law.
SONOMA COUNTY HUMAN SERVICES DEPARTMENT et al., Plaintiffs and Respondents,
v.
EVITA H., Defendant and Appellant.
Docket No. A074137.
Court of Appeals of California, First District, Division Two.
May 13, 1997.
*1389 COUNSEL
Alan Siraco for Defendant and Appellant.
James P. Botz, County Counsel, and Tara Harvey, Deputy County Counsel, for Plaintiffs and Respondents.
OPINION
HAERLE, J. 

I. INTRODUCTION
This is an appeal from a March 29, 1996, order of the juvenile court granting Roger H. of Arkansas de facto parent status as to the fifteen-year-old minor who was one of the three juvenile subjects of the proceeding below. It is also a purported appeal from a portion of an April 8, 1996, order of the same court permitting the minor to go to Arkansas "for a ninety-day trial home visit" with Roger H. We affirm the former order and dismiss the purported appeal from the latter.

*1390 II. FACTUAL AND PROCEDURAL BACKGROUND
In early 1995 appellant Evita H. (sometimes hereafter the mother) and her three children were living in Lake County. On April 18 of that year, the three minors were taken into protective custody by the Clear Lake Police Department. Three days later, petitions were filed on behalf of each child under Welfare and Institutions Code section 300, subdivision (b). The petitions alleged that the children had suffered or would suffer serious physical harm as a result of the failure of appellant to provide adequate food, clothing, shelter or medical care and by her inability to provide regular care due to, among other things, substance abuse.
The petitions included specific allegations to the effect that the mother's home was without adequate food, heat or water, as well as the fact that drugs and drug paraphernalia were found in the home, including in the children's rooms. The petitions further alleged that the mother was taking a variety of prescription drugs that affected her ability to care for her children.
In May 1995 a jurisdictional hearing was held in Lake County Superior Court; that court sustained the allegations of the petition. The following month the case was transferred to Sonoma County, where the mother was then residing.
Brandon, the child that is the subject of this appeal, was 13 years old at the time of the jurisdictional hearing and is now 15. His biological father, James M., has never been involved with his son and his whereabouts are totally unknown. When Brandon was five months old, the mother met Roger H. and shortly thereafter they began living together in Washington State. Two half brothers, Marcus and Joshua, the other two children who were subjects of the original petitions, were born to the couple in 1982 and 1983 respectively. Their parents were married in 1983.
Between 1983 and 1989, the family moved from Washington State to Missouri and then to Texas. The mother and Roger H. separated in May 1989; their marriage was subsequently dissolved and Roger H. moved to Arkansas where he presently resides with his current wife and stepchildren. After the separation, the mother had primary custody of the children, with Roger H. retaining visitation rights with all three children until the mother moved with them to California in late 1989.
The evidence is conflicting regarding Roger H.'s knowledge concerning and contact with the children during the first few years of their residency in California. There is, however, no dispute that contact between all three of *1391 the boys and Roger H. was renewed in 1992. Indeed, according to Roger H., Brandon called him to ask for assistance in paying outstanding bills for the family. Once contact was reestablished, all three of the boys spent time with Roger H. in Arkansas every year; in 1994, Brandon stayed there for several months. In early 1995, Brandon called Roger H. to ask for money to pay outstanding water bills. Subsequent investigations (initiated in part at least by a call made by Roger H. to Lake County Child Protective Services) led to the filing of the original petitions on behalf of all three children.
Brandon and his two half brothers are all recognized members of the Stewart's Point Rancheria Tribe of Pomo Indians (the Tribe).
The contested disposition hearing was scheduled for September 1995 in Sonoma County. Roger H. and the mother both asked that the children be placed with them. Additionally, an interstate contract for the placement of children was initiated with Arkansas and a home study of Roger H. was requested.
At a settlement conference on August 28, 1995, prior to the disposition hearing, the parties were able to come to an agreement, which included a stipulation that (a) Roger H. would have two supervised visits with the three boys before returning to Arkansas, (b) the minors would be placed in an approved Indian foster home, (c) the mother would have supervised visitation with the minors, and (d) reunification services would be offered to both the mother and Roger H.
A six-month review hearing was set for March 1, 1996.[1] In the six-month report prepared for the court, the social worker extensively discussed the boys' current situation and each parent's progress (or lack thereof) in completing their respective service plans; it also made recommendations to the court. The social worker addressed in detail the mother's continued denial of prior drug use and her failures with respect to her service plan. The social worker also made, rather emphatically, the point that the three boys "should not be separated, as Ms. [H.] well knows. Their emotional survival depends upon their remaining intact as a team. As one goes, so goes the rest. Brandon's younger brothers would not countenance being separated from their brother for any reason, nor should they."
In advance of the six-month hearing, Roger H. filed a request that he be declared the de facto parent of Brandon. A hearing on this request was also set for March 1. On that date, all parties were in court. Additionally, the Tribe, which had been involved with the dependency process, filed a notice *1392 of appearance of its attorney of record, California Indian Legal Services, Inc. Its attorney appeared at the March 1 hearing, accompanied by the chairperson of the Tribe.
At that hearing, the mother objected to the department's recommendations that her reunification services be terminated and that the children be placed with Roger H. She also opposed Roger H.'s request to be declared Brandon's de facto father. As a result, the matter was placed on the court's master calendar for March 29 for the scheduling of a contested review hearing. The court directed that any party wishing to respond to Roger H.'s motion regarding de facto parent status do so within 10 days. The mother filed her opposition to Roger H.'s motion on March 11. Two days later, the Tribe filed a pleading regarding the same motion, effectively stating that de facto status should be granted to Roger H. Simultaneously, it filed a "Statement in Support of Transfer of Minors to Custody of Roger H[.]" reiterating that position.
On March 29, Judge Arnold Rosenfield filed a written order granting Roger H.'s motion to be declared Brandon's de facto parent. On the same day, the case was assigned for the contested hearing to Judge Raymond Giordano, with that hearing scheduled to commence on April 1.
All parties were present in court on that day. After opening statements by each of the attorneys present, and a recess to permit the court to study the six-month report and the Arkansas "home study" that had been completed on Roger H., counsel requested a conference with the judge. After that conference, a settlement agreed to by all parties was put on the record. The gist of the settlement was that all three boys would commence a ninety-day trial visit with Roger H. in Arkansas, after which they would be returned to California for a visit with appellant, reunification services to appellant would be continued, and the matter would be reviewed again by the court in July. A formal order to this effect was signed by Judge Giordano on April 4 and filed four days later.
On April 26, the mother filed a timely appeal from the court's written order granting Roger H.'s motion to be declared Brandon's de facto parent.

III. DISCUSSION

A. The Mother's Appeal From the Court's Order Granting Roger H. "De Facto Parent" Status

The mother's appeal from the court's March 29 order granting de facto parent status to Roger H. is based entirely on a single premise: California's *1393 de facto parent doctrine is preempted by the federal Indian Child Welfare Act (25 U.S.C. §§ 1901-1923) (ICWA). Addressing this contention requires some brief review of (a) the doctrine of preemption, (b) California's de facto parent doctrine, and (c) the purpose and thrust of the ICWA.
The preemption doctrine derives from the supremacy clause of the United States Constitution which declares that the "Laws of the United States ... shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." (U.S. Const., art. VI, cl. 2.)
"(1) Whether federal law preempts state law `fundamentally is a question of congressional intent....' [Citations.]" (Smiley v. Citibank (1995) 11 Cal.4th 138, 147 [44 Cal. Rptr.2d 441, 900 P.2d 690], affd. ___ U.S. ___ [116 S.Ct. 1730, 135 L.Ed.2d 25].) When addressing a preemption question, we start "`with the assumption that the historic police powers of the States [are] not to be superseded by ... Federal Act unless that [is] the clear and manifest purpose of Congress.'" (Cipollone v. Liggett Group, Inc. (1992) 505 U.S. 504, 516 [112 S.Ct. 2608, 2617, 120 L.Ed.2d 407]; see also Smiley v. Citibank, supra, 11 Cal.4th at p. 148.) "Therefore, courts should proceed on `the conviction that the proper approach is to reconcile the operation of both statutory schemes with one another rather than holding one completely ousted.'" (Storer Cable Com. v. City of Montgomery, Alabama (M.D.Ala. 1992) 806 F. Supp. 1518, 1531, quoting Merrill Lynch, Pierce Fenner & Smith v. Ware (1973) 414 U.S. 117, 127 [94 S.Ct. 383, 389-390, 38 L.Ed.2d 348].)
Preemption may arise in three ways. "`First, Congress can define explicitly the extent to which its enactments pre-empt state law.' [Citations.] `Second, in the absence of explicit statutory language, state law is pre-empted where it regulates conduct in a field that Congress intended the Federal Government to occupy exclusively.' [Citations.] `Finally, state law is pre-empted to the extent that it actually conflicts with federal law.' [Citations.]" (Smiley v. Citibank, supra, 11 Cal.4th at p. 147.)
(2) California's doctrine of de facto parent status is a judicially created doctrine, but one which is now spelled out in the California Rules of Court. Rule 1401(a)(4) provides: "`De facto parent' means a person who has been found by the court to have assumed, on a day-to-day basis, the role of parent, fulfilling both the child's physical and psychological needs for care and affection, and who has assumed that role for a substantial period." (Cal. Rules of Court, rule 1401(a)(4).)
Rule 1412(e) explains what this status means: "[De facto parents] Upon a sufficient showing the court may recognize the child's present or previous *1394 custodians as de facto parents and grant standing to participate as parties in disposition hearings and any hearing thereafter at which the status of the dependent child is at issue. The de facto parent may: [¶] (1) Be present at the hearing; [¶] (2) Be represented by retained counsel or, at the discretion of the court, by appointed counsel; [¶] (3) Present evidence." (Cal. Rules of Court, rule 1412(e).)
This doctrine stems from the case of In re B.G. (1974) 11 Cal.3d 679 [114 Cal. Rptr. 444, 523 P.2d 244]. Justice Baxter, writing almost two decades later in In re Kieshia E. (1993) 6 Cal.4th 68 [23 Cal. Rptr.2d 775, 859 P.2d 1290], summarized the holding of that case as follows: "In In re B.G.[, supra,] 11 Cal.3d 679 ..., this court established an important rule of procedure for child custody and dependency cases. We held that one who is not the child's parent or legal custodian, but who has become a `de facto parent' by assuming that daily role over substantial time, may be privileged to participate as a party to the court proceedings." (Id. at pp. 70-71.) "Alluding to a recent book on custody policy, we observed that a nonparent who has undertaken the parental role on a day-to-day basis, `seeking to fulfill both the child's physical needs and his psychological need for affection and care[, may become the child's de facto parent]. [Citation.]' [Citation.] We concluded that one who `assumes the role of parent, raising the child in his own home,' may, in time, acquire an `interest' which is `substantial' in the `"companionship, care, custody, and management"' of the child. [Citation.] [¶] ... [¶] Hence, we concluded, de facto parents should be permitted `to appear as [full] parties,' not mere amici curiae, in a juvenile dependency proceeding. Their standing, we stressed, does not depend upon pending guardianship applications. Rather, we held, the fact of de facto parenthood alone should entitle them to intervene and protect their `own interest' in the child's care and custody. [Citation.]" (Id. at pp. 75-76.)
Justice Baxter then articulated the present status of the doctrine in the following words: "The de facto parenthood doctrine simply recognizes that persons who have provided a child with daily parental concern, affection, and care over substantial time may develop legitimate interests and perspectives, and may also present a custodial alternative, which should not be ignored in a juvenile dependency proceeding. The standing accorded de facto parents has no basis independent of these concerns. Moreover, as we said in In re B.G., supra, the key to the privileged status of de facto parenthood is adherence to `the role of parent,' both physical and psychological. [Citations.]" (In re Kieshia E., supra, 6 Cal.4th at pp. 77-78; see also In re Patricia L. (1992) 9 Cal. App.4th 61, 66-67 [11 Cal. Rptr.2d 631]; In re Rachael C. (1991) 235 Cal. App.3d 1445, 1449-1452 [1 Cal. Rptr.2d 473], overruled on other grounds in In re Kieshia E., supra, 6 Cal.4th at p. 80.)
*1395 Finally by way of legal background, we come to the ICWA. The United States Congress enacted that statute in 1978. In so doing, it adopted findings that, among other things, noted that Indian children were a vital resource "to the continued existence and integrity of Indian tribes" and that "the United States has a direct interest ... in protecting Indian children who are members of ... an Indian tribe." (25 U.S.C. § 1901(3).) It went on to state that "an alarmingly high percentage of Indian families are broken up by the removal, often unwarranted, of their children from them" and that such children are often "placed in non-Indian foster and adoptive homes...." (25 U.S.C. § 1901(4).) The pertinent congressional findings concluded as follows: "[T]he States, exercising their recognized jurisdiction over Indian child custody proceedings through administrative and judicial bodies, have often failed to recognize the essential tribal relations of Indian people and the cultural and social standards prevailing in Indian communities and families." (25 U.S.C. § 1901(5).)
Congress then declared: "[I]t is the policy of this Nation to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture, and by providing for assistance to Indian tribes in the operation of child and family service programs." (25 U.S.C. § 1902.)
In a 1989 decision, the United States Supreme Court summarized the ICWA's essential thrust in these words: "At the heart of the ICWA are its provisions concerning jurisdiction over Indian child custody proceedings. Section 1911 lays out a dual jurisdictional scheme. Section 1911(a) establishes exclusive jurisdiction in the tribal courts for proceedings concerning an Indian child `who resides or is domiciled within the reservation of such tribe,' as well as for wards of tribal courts regardless of domicile. Section 1911(b), on the other hand, creates concurrent but presumptively tribal jurisdiction in the case of children not domiciled on the reservation: on petition of either parent or the tribe, state-court proceedings for foster care placement or termination of parental rights are to be transferred to the tribal court, except in cases of `good cause,' objection by either parent, or declination of jurisdiction by the tribal court. [¶] Various other provisions of ICWA Title I set procedural and substantive standards for those child custody proceedings that do take place in state court.... The most important substantive requirement imposed on state courts is that of § 1915(a), which, absent `good cause' to the contrary, mandates that adoptive placements be made preferentially with (1) members of the child's extended *1396 family, (2) other members of the same tribe, or (3) other Indian families. [¶] The ICWA thus, in the words of the House Report accompanying it, `seeks to protect the rights of the Indian child as an Indian and the rights of the Indian community and tribe in retaining its children in its society.' [Citation.] It does so by establishing `a Federal policy that, where possible, an Indian child should remain in the Indian community,' [citation] and by making sure that Indian child welfare determinations are not based on `a white, middle-class standard which, in many cases, forecloses placement with [an] Indian family.' [Citation.]" (Mississippi Choctaw Indian Band v. Holyfield (1989) 490 U.S. 30, 36-37 [109 S.Ct. 1597, 1602, 104 L.Ed.2d 29] (Holyfield), fn. omitted.)
(3a) With this background, we come to the mother's contention that the ICWA preempts California's de facto parent doctrine as and when a court attempts to apply that doctrine to Indian children. It will be recalled that there are three ways federal law may be found to preempt state law: (1) by virtue of an express preemption clause in the federal law; (2) by "implied preemption," otherwise sometimes referred to as the "occupation of the field" by the federal government; or (3) by virtue of a conflict between the provisions of federal and state law.
It is clear that neither of the first two principles obtains here. In the first place, the federal law contains nothing at all by way of an express preemption provision. Second, it simply cannot be maintained that the ICWA in any way, manner, shape or form "occupies the field" of child custody or adoption, even as to Indian children. As respondent points out, the ICWA is totally devoid of any provisions dealing with, e.g., the bases on which a child may be removed from a parent's custody, when and how often hearings must be held to review a child's status, who is entitled to what reunification services and for how long, or many, many other similar issues.
Appellant's claim of preemption must, therefore, depend, and depend exclusively, upon a showing that there is a "conflict" between the California de facto parent principle and one or more provisions of the ICWA. Appellant asserts that such a conflict indeed exists and that it derives from the fact that, whereas de facto parent status may be conferred upon one who has no "biological or cultural relationship to the minor, such a designation does not fit within any of the categories of caretakers contemplated by the ICWA." She points out, among other things, that 25 United States Code section 1915(b), mandates that "[i]n any foster care or preadoptive placement, a preference shall be given, in the absence of good cause to the contrary, to a placement with  [¶] (i) a member of the Indian child's extended family; [¶] (ii) a foster home licensed, approved, or specified by the Indian child's tribe *1397 ..." etc. From this, appellant argues that "Congress clearly intended to prevent the placement of Indian children with non-Indian, nonbiologically-related parties unless there was no alternative."
(4) The United States Supreme Court's basic approach to preemption in alleged conflicts between Indian rights and status and state law was set forth most recently in New Mexico v. Mescalero Apache Tribe (1983) 462 U.S. 324 [103 S.Ct. 2378, 76 L.Ed.2d 611], where the court held that the application of New Mexico's hunting and fishing laws to even nonmembers of a tribe present on an Indian reservation was preempted by federal law and by the tribe's own regulatory scheme. It stated the general rule to be: "State jurisdiction is pre-empted by the operation of federal law if it interferes or is incompatible with federal and tribal interests reflected in federal law, unless the state interests at stake are sufficient to justify the assertion of state authority." (Id. at p. 334 [103 S.Ct. at p. 2386].) The court went on to recognize, however, that a state's interests "will be particularly substantial if the State can point to off-reservation effects...." (Id. at p. 336 [103 S.Ct at p. 2388].)
Our colleagues in the Second District discussed this issue as it applied to the ICWA in the recent and leading case of In re Bridget R. (1996) 41 Cal. App.4th 1483 [49 Cal. Rptr.2d 507]. They said: "The principles of tribal self-government, grounded in notions of inherent sovereignty and in congressional policies, seek an accommodation between the interests of the tribes and the federal government on the one hand, and those of the states, on the other. [Citation.] Thus, the United States Supreme Court has held nonreservation Indians are generally subject to nondiscriminatory and generally applicable state laws `[a]bsent express federal law to the contrary.' [Citation.] Even on Indian reservations, state laws generally may be applied insofar as they do not interfere with reservation self-government or essential internal tribal affairs, or impair a right reserved by federal law. [Citation.] [¶] Jurisdiction over matters of family relations is traditionally reserved to the states. [Citations.] Thus, where it is contended that a federal law must override state law on a matter relating to family relations, it must be shown that application of the state law in question would do `"major damage" to "clear and substantial federal interests." [Citations].' [Citation.]" (Id. at p. 1510.)
(3b) We do not believe that any "major damage" can or will be done to either federal law or Indian tribal law, custom, status or rights, as the same are posited in the ICWA, from the application of California's de facto parent doctrine in this case. Congress clearly intended that its 1978 statute exist side-by-side with the child custody laws of the 50 states and necessarily *1398 understood that the courts of those states would and should attempt to harmonize, not presume conflicts between, the two. The drafters of the California Rules of Court were clearly of a similar frame of mind because, shortly following the very same rules that articulate the de facto parent principle (Cal. Rules of Court, rules 1401(a)(4) and 1412(e)), there appears almost in haec verba the ICWA, reduced to a California court rule. (See Cal. Rules of Court, rule 1439.) We have great difficulty with the proposition that we can or should readily find conflict between one California juvenile court rule and two others.
Nor can we in point of fact. The relevant provision of the ICWA on which appellant relies is 25 United States Code section 1915(b) which, as noted above, provides that, "in the absence of good cause to the contrary," preference in foster or preadoptive placement be given to "(i) a member of the Indian child's extended family...." (25 U.S.C. § 1915(b).) Section 1903(2) says the latter term "shall be as defined by the law or custom of the Indian child's tribe or, in the absence of such law or custom, shall be a person who has reached the age of eighteen and who is the Indian child's grandparent, aunt or uncle, brother or sister, brother-in-law or sister-in-law, niece or nephew, first or second cousin, or stepparent." (25 U.S.C. § 1903(2).)
There are several things that are, for present purposes, noteworthy about the combination of these two statutes. First, and referring to the definition of "extended family," it should be noted that Roger H. was once the "stepparent" of Brandon.[2] Thus, although probably not now within the federal act's definition of "extended family," he clearly was in the recent past. Second, nothing in these sections, or any other provision of the ICWA for that matter, says that any of the people to whom preference should be given as custodians of an Indian child must be of Indian heritage themselves. Third, and perhaps most importantly, the language and tenor of 25 United States Code section 1915(b) manifestly bespeaks flexibility: It provides only for a "preference," notes that even the preference gives way when there is "good cause to the contrary," and is preceded by an opening sentence which provides that a child "shall be placed in the least restrictive setting which most approximates a family and in which his special needs, if any, may be met." (25 U.S.C. § 1915(b).) This language hardly suggests a congressional intention to mandate maintenance of a connection with the pertinent Indian tribe when all other factors point in the opposite direction.
In any event, the de facto parent doctrine is substantially consistent with the spirit of these provisions and not at all in conflict with their letter. It is, *1399 in effect, the ICWA's "extended family" definition made more flexible. Put another way, marrying the de facto parent doctrine and the pertinent ICWA sections means, and means only, that the scope of the persons to whom preference should be given for custody (or, for that matter, for adoption  see 25 U.S.C. § 1915(a)) is expanded from the already broad definition of "extended family" found in section 1903(2) to a group that includes those encompassed by that definition and the persons embraced by the California de facto parent definition. That is not a conflict. It is, at most, a relatively minor expansion of the definition and an expansion that does no violence to any mandate of the ICWA as to the blood line or cultural heritage of the persons who compose the "extended family."
We take special note of the fact that, in this case, the Tribe filed not one but two pleadings specifically endorsing the motion of Roger H. to be declared the de facto parent of Brandon. In one of these pleadings, the Tribe's counsel stated: "In the Tribe's opinion and in keeping with its traditions, the fact that Brandon is not the biological child of Mr. [H.] is not of great importance. If Brandon considers Mr. [H.] his father, then the Tribe will as well."[3] Perhaps, as appellant argues, these statements do not rise to the level of a tribal "resolution" regarding a "different order of preference" (see 25 U.S.C. § 1915(c)), but they are nonetheless significant to us.[4]
The mother argues that the United States Supreme Court's 1988 decision in Holyfield, supra, 490 U.S. 30 supports preemption here. We disagree. That case dealt with the question of whether the Mississippi courts or the tribal courts had jurisdiction over the adoption of Indian twins. That issue, in turn, depended on whether Mississippi or tribal law controlled on the issue of whether the twins were "domiciled" on the reservation. Reversing the Mississippi Supreme Court, the high court held that, under the ICWA, tribal law controlled. The opinion said nothing whatsoever concerning the doctrine of preemption.
To the extent there is any California authority on point, it too runs contrary to the mother's position. In two recent cases, our sister courts have rejected arguments that the ICWA preempts procedural and jurisdictional *1400 precepts applicable to juvenile court proceedings. (See In re Pedro N. (1995) 35 Cal. App.4th 183, 190 [41 Cal. Rptr.2d 819]; Slone v. Inyo County Juvenile Court (1991) 230 Cal. App.3d 263, 266-268 [282 Cal. Rptr. 126].)
It is also noteworthy that one recent and extensive law review article suggests that the ICWA may not apply to "interfamilial child custody disputes" at all. (See Atwood, Fighting Over Indian Children: The Uses and Abuses of Jurisdictional Ambiguity (1989) 36 UCLA L.Rev. 1051, 1093, 1106, and cases cited therein.) Indeed, this was exactly the reasoning of a case decided four years later by a Minnesota appellate court, Matter of Custody of K.K.S. (Minn. Ct. App. 1993) 508 N.W.2d 813. In that case, the court stated that 25 United States Code section 1903(1) of the ICWA (the provision which defines "child custody proceeding") effectively means that "[n]o federal law or policy preempts state power over interparental child custody disputes where the Indian child and at least one parent reside off the reservation." (508 N.W.2d at p. 816.)[5]
In summary, we find no conflict between any provision of the ICWA and application of California's de facto parent doctrine in this case and, accordingly, reject appellant's argument that the latter is preempted by the former.

B. The Mother's Purported Appeal From the Court's Order Regarding a "Trial Home Visit"

The mother also purportedly appeals from "[t]he order placing Brandon with Mr. H[.]...." We assume this must refer to paragraph 4 of the trial court's order of April 8, 1996, which says: "The minors are placed with Mr. Roger H[.] ... the de facto father of Brandon, in Flippen, Arkansas, for a ninety-day trial home visit under the courtesy supervision of Marion County [Arkansas] Child Protective Services, to commence immediately...."
There are at least three insurmountable problems with this purported appeal. First of all, the mother's notice of appeal in this case referred, and referred only, to the trial court's "March 29, 1996, order by Judge Arnold *1401 Rosenfield granting DeFacto Parent Status to Roger H[.]." That notice does not, therefore, permit the briefing of a completely separate issue addressed by a different judge in a subsequent order.
Perhaps more importantly, the "ninety-day trial home visit," as well almost all the rest of the court's April 8 order, was an upshot of settlement discussions undertaken by Judge Giordano in his chambers on April 1. The results of those discussions were thereafter expressly agreed to in open court by all counsel, including the mother's. Patently, she cannot now be heard to complain of that portion of the court's order.
Finally, we note that the order spoke of only a "ninety-day trial home visit" to commence in the spring of last year; any issue relating to the propriety of such an idea is now patently moot.

IV. DISPOSITION
The trial court's March 29, 1996, order granting Roger H. de facto parent status is affirmed. The mother's purported appeal from so much to the court's April 8, 1996, order as permits the minor to go to Arkansas for a "ninety-day trial home visit" with Roger H. is dismissed.
Kline, P.J., and Ruvolo, J., concurred.
Appellant's petition for review by the Supreme Court was denied August 20, 1997.
NOTES
[1] All subsequent dates are in 1996.
[2] Of course, Roger H. is also the natural father of Brandon's two half brothers who, as noted by the social worker in the six-month report, are very closely bonded with him.
[3] At the April 1 hearing, after the court had issued its order granting Roger H. de facto parent status, the Tribe's counsel reiterated its support for that action and for the placement of all three children with him.
[4] At oral argument, counsel for the Sonoma County Department of Social Services suggested that the above-quoted statement suggests a "law or custom" of the Tribe defining "extended family member" so as to include Roger H., something expressly countenanced by 25 United States Code section 1903(2) of the ICWA. We think the record before us does not permit us to go this far; after all, the trial court made no such finding nor did the Tribe's counsel even use the key words of the statute. However, as we have already noted, the Tribe's position in the court below that the application of the de facto parent doctrine in this case does no violence to its interests is certainly meaningful.
[5] Also finding no preemption (albeit involving substantially procedural issues) are: Matter of Adoption of T.N.F. (Alaska 1989) 781 P.2d 973, 981; Matter of J.R.B. (Alaska 1986) 715 P.2d 1170, 1173; and New York City DSS v. Oscar C. (1993) 192 A.D.2d 280 [600 N.Y.S.2d 957, 961]. Courts which have found provisions of the ICWA preempting state substantive law or procedure have done so because of an irreconcilable conflict between the two or because, under the ICWA, a tribal court had jurisdiction over the parties. (See, e.g., In re Adoption of M.T.S. (Minn. Ct. App. 1992) 489 N.W.2d 285, 288; Matter of Adoption of Mellinger (1996) 288 N.J. Super. 191 [672 A.2d 197, 198-199]; Matter of Adoption of Halloway (Utah 1986) 732 P.2d 962, 969-970.)