53 Cal.Rptr.3d 324 (2006)
146 Cal.App.4th 1048
In re M.V., a Person Coming Under the Juvenile Court Law.
San Mateo County Human Services Agency, Plaintiff and Respondent,
v.
Tina F. et al., Defendants and Appellants.
No. A112525.
Court of Appeal of California, First District, Division Two.
December 14, 2006.
*325 Amy Z. Tobin, by appointment of the Court of Appeal, under the First District Appellate, Project's Independent Case System, for Appellants.
Thomas F. Casey III, County Counsel, Peter K. Finck, Deputy, for Respondent.
John Carcione, Carcione, Cattermole, Dolinski, et al, for Minor.
Kevin Thurber, San Francisco, for De Facto Parents.
LAMBDEN, J.
M.V., who was born in February 2004, was removed from his home pursuant to Welfare and Institutions Code section 300, subdivisions (a) and (e),[1] on July 7, 2004. He was placed with foster parents, Tina F. and B.F. (collectively, foster parents). Tina was declared the de facto parent of M.V. on July 11, 2005. Subsequently, M.V. was either scratched or bitten[2] by the family dog on his face and the juvenile court granted the section 388 petition filed by San Mateo County Human Services Agency (agency) to modify the placement of M.V.
On appeal, foster parents argue that we should reverse the granting of the section 388 petition because the juvenile court never specified either in open court or in its written findings the standard of proof it applied. Foster parents contend the court should have used the clear and convincing evidence standard, while agency maintains the proper standard of proof was preponderance of the evidence. Further, foster parents argue, under any standard of proof, the juvenile court abused its discretion in granting the motion for modification. We conclude that reversal is required because the lower court's findings are inadequate and it is unclear whether the court considered the best interests of the child. We therefore reverse and remand with directions to the juvenile court to make findings and to conduct further proceedings consistent with this opinion.

BACKGROUND
M.V. was born in February 2004. On July 7, 2004, a petition pursuant to section 300, subdivisions (a) and (e) was filed and, subsequently, M.V. was made a dependent of the court.[3] M.V. was placed with foster parents, and Tina was declared a de facto parent on July 11, 2005.
On October 26, 2005, agency filed a petition pursuant to section 388 to modify the out-of-home placement of M.V. with Tina to another licensed foster home. The petition alleged that on October 20, 2005, M.V. received multiple facial injuries from the foster family's dog. The petition specified that "[t]here were multiple puncture wounds on the child's [jawline] and lower right lip, there were five linear scratch marks across the child's right cheek and there were scratch marks behind his right *326 ear and on the edge of the right ear." Also contained in the petition was the social worker's assertion that she had previously observed scratch marks on M.V.'s face and arms and that she had told Tina to separate the child from the foster family's dog and cats. The petition further alleged that the dog, a Rottweiler, was alleged to have bitten Tina's biological son on his hand earlier that year. The petition stated that M.V., who was 20 months old at the time, was not developmentally capable of interacting appropriately with the animals and would be vulnerable to future injury.
With regard to the reasons why the requested modification was in the child's best interests, the petition alleged: "The foster family has not taken the previous injuries seriously to their child nor to the foster child and the child suffered multiple facial injuries. The foster family's dog is a Rottweiler and weighs about fifty to sixty pounds and is a danger to the child in addition to the numerous cats. Because of the child's young age and small size he is vulnerable to further injury. Four (4) pictures of the child's injuries are attached hereto and made a part of this Motion."
The petition indicated that the attorney for M.V., as well as the foster parents' attorney, opposed agency's section 388 petition.
On October 26, 2005, the juvenile court found that the petition stated a prima facie case for modification and set the matter for hearing on October 28, 2005.
Agency filed an interim review report dated October 28, 2005. The report indicated that Tina called and left a voice mail message for the social worker on October 20, 2005, about 9:00 p.m., advising her that M.V. had been bitten by the family dog and that she had taken him to the hospital's emergency room for treatment. The following morning, about 8:15 a.m., Tina called and spoke with the social worker's supervisor. That same day, the social worker called Tina. Tina reported that M.V. had been bitten by their dog and she had taken him to the hospital. Tina maintained that the hospital staff could not determine whether the marks on M.V.'s face were bites or scratches. She also stated that the hospital asked her to decide whether M.V. should get stitches or liquid stitches; she chose the latter. Tina also told the social worker that the hospital staff did not believe the injuries met the criteria for a vicious dog attack and the staff did not file a vicious dog report. The social worker wrote that Tina tried to minimize M.V.'s injuries by asserting that the nurse at the emergency room had joked about the injuries.
The social worker wrote in the report that Tina told her that the incident with the dog occurred when she was in another room doing laundry and M.V., the dog, and Tina's 14-year-old stepdaughter were in the kitchen. The stepdaughter heard the dog growl and then Tina heard M.V. scream. As soon as she saw that M.V. was injured, Tina took him to the hospital. The social worker wrote: "The foster mother stated that she `knew something was going to happen' to the child and then she stated that she had allowed the dog to lick the child's face the morning after the injury. The foster mother went on to explain that she wanted `the dog and the child to have a friendly relationship [and that she did not want the child to] be scared....'" Further, when the emergency worker spoke with Tina on October 24, 2005, Tina stated several times that children must learn there are limits and boundaries to things they can do with animals, and the emergency worker asked Tina three separate times if she were blaming the child. Tina stated that she was going to take the dog's food bowl and *327 toys out of the house, but she did not mention or discuss separating M.V. from the dog.
The court held the hearing on the section 388 petition on October 28, 2005. The parties stipulated that M.V. was injured by the family dog and that the wound appeared to be a bite. Additionally, counsel stipulated to the "authenticity" of the four photographs of M.V.'s injuries taken by the Court Appointed Special Advocate (CASA) on October 21, 2005.
The social worker who prepared the interim report testified. She testified as to what Tina had told her, and her testimony was essentially the same as what she had written in her report. When asked about a prior incident involving the dog and the foster parents' biological child, she stated that there had been a referral to Children's Protective Services (CPS) in April 2005. The report was principally concerned with the child's hand being caught in the door, but it also mentioned that the child had been injured by the dog.
B.F. also testified. He stated that their family dog is a mutt. He received the dog from his sister, and her dog is a hound. The dog's father was unknown, but he presumed the father was a Rottweiler because their dog has many of the markings of a Rottweiler.
B.F. stated that he was familiar with the CPS referral in April 2005 and the incident between their son and their dog. He stated the incident involving the dog and their son occurred in January 2005. At that time, their oldest daughter, their son, and he were in the same room; their son was playing with the dog. Their son picked up the dog's rawhide bone and was getting the dog to chase it. His son then took the bone away from the dog and placed the bone behind his own head. The dog jumped at the bone and came down and "struck" his son on his cheek. The wound bled for a couple of minutes, and he was taken to the family doctor the next day. The wound was not deep enough for stitches.
B.F. said that CPS considered this incident an accident. B.F. testified that Tina and he were already taking the dog, who was about 10 months old, to obedience training. The evening following the incident with their biological son, they went to a dog training session and talked to the trainer about the incident. The trainer recommended removing all rawhide bones from the home, which he asserted they did. She also recommended that all roughhouse play with their son and the dog be eliminated, which B.F. asserted they also implemented. He stated that they also removed all the dog toys from the house and placed them outside. The dog completed a 10- or 12-week obedience training class and B.F. claimed that he was "the star of his class."
When asked whether it was safe for the dog to be around M.V., B.F. responded: "It's unacceptable for a family pet to respond in that way no matter what might precipitate that event. [¶] And he can't be in the house, and he can't be at our house; he needs to find a new home." When asked whether the solution was to get rid of the dog, he responded, "Yeah."
B.F. was also asked about scratches that the social worker had previously observed on M.V. B.F. indicated that they were from the cats and that they have carefully watched M.V. while he was around the pets. B.F. asserted: "We worked really hard with him, teaching him how to pet the cats from head to tail so it doesn't rough their fur, how to be appropriate around pets."
The court also asked B.F. a few questions. The court stated that B.F. said the dog struck his son, and it wanted to know what part of the dog struck his son. B.F. *328 responded that it was one of his teeth. The court asked, "So it was a bite?" B.F. responded, "Yes, definitely."
Tina also testified. She stated that she took complete responsibility for the fact that the family dog hurt M.V. When asked what she did wrong, she stated: "I left a little boy in a room while I decided to go out and tend to laundrywith our dog. [¶] My daughter was in the other room. I assumed she was paving attention. I am the adult, and I shouldn't have made that assumption. I made a bad judgment." She stated that she did not tell the social worker that she knew something was going to happen to M.V. She noted that she had a conversation with the social worker at another time and she stated that M.V. was a very active child and that she was concerned that there "would be some point in time where he would have an injury." She also denied letting the dog lick M.V.'s face the day following the injury. She stated that it would not have been appropriate to let the dog lick his face because the instructions were that the liquid bandages were not to get wet and the licking could cause an infection. She stated that she did not allow any contact between the dog and M.V. on the day following the incident.
When asked why the court should entrust M.V. to her care despite her bad judgment on October 20, 2004, Tina responded: "Because he's been with us for 16 months. I made a really bad mistake, and I will always have to live with that. And I'm sorry. I take full responsibility, [¶] But we love that little boy. And he has become a part of our family. He's bonded with our son. We thought that we could try and teach children to get along with family animals, but I think what I learned is you can't do that. [¶] And the animals are gone. We've made that choice. [M.V.] will not be harmed anymore."[4]
During argument by counsel for the foster parents, the court interrupted counsel when he said that B.F. was "straightforward. ..." The court interjected: "Except it bothered me that he insisted on saying the dog struck [his son], and I had to pursue whether it was a bite. [¶] The reluctance in the courtroom to acknowledge it was an injury caused by the dog's teeth is of grave concern to me. [¶] His pride of the dog being the star of the obedience schoolI'm sorry. The dog is not even close to being at the same level as a human being ... [¶] It's reading between the lines that causes me more concern than I had prior."
The court continued: "It's not a matter of being pleased. It's a matter of somebody on the witness stand saying, `The dog bit my kid.' [¶] It's his child, not my dependent child, that was bit. And he can't even bring himself to acknowledge that [his son] was bitten, [¶] His explanation was, and I quote from the record, that, `[the dog] struck [his son.]' [¶] Not only is he personifying the dog; it's not being open, and there's still that element of denial. [¶] Now, maybe I am putting too much on the importance of symbolism of language, but that's what we do here."
The attorney for M.V. argued that the foster parents "deserve and should get a severe knuckle rapping or severe statements to them for them to understand what they did was wrong. It's not excusable at all. [¶] But I also weigh that against how [M.V.] has lived in their home for 16 of the 20 months that he's been *329 alive. [¶] I saw [M.V.] yesterday in the home he is at now. He looks uncomfortable. We would like to think that [M.V.'s] future will be good, but I feel like this is the first point where in [M.V.'s] everyday life, the wayI mean, the decisions since the initial incident that brought about the dependency action, that right now [M.V.'s] psyche is being affected and he doesn't understand what's going on. [¶] It's difficult, but I think, after hearing the assurances that the [foster parents] have given and how the dog will not be in the house, and with severe statements given to them by your Honor, that [M.V.] should be returned."
The two attorneys for the biological parents told the court that they agreed with agency's section 388 motion.
Finally, the court heard from the CASA. The CASA for M.V. stated that the foster parents made a serious mistake in allowing M.V. to be with the dog unattended. The CASA for M.V. stated: "In the times I have been in the house observing [M.V.], which is approximately between five and ten times, I haveevery time I have returned with [M.V.], they've either put the dog outside or he hasn't been inside in the first place. So I haven't seen him engaging with the dog directly. [¶] I feel, just as the CASA for [M.V.] and not everybody else involved, that from his little perspective, the place that he wants to be most if he could verbalize that, would be at the [foster parents'] home. He's very bonded, and I have seen the great relationship he has with the [foster parents'] other children. [¶] Not that he hasn't necessarily experienced some degree of trauma from the dog bite. But I am sure if he was older and he could express his wishes, that is what he would most likely say. [¶] And I feel that even though this does reflect a lack of judgment around the issue of pets, I am not sure whether that can be extended, from what I have seen of them, to imply that we have a lack of judgment about other areas of his safety. As I have directly seen them be very careful in other areas, like safety gates or making sureso he's always being watched, [¶] So I feel if the pets aren't there, and that was the area in which the lack of judgment occurred, then their place would be safe for him to be returned. [¶] ... [¶] But from [M.V.'s] perspective, he's going to be best served in their house with the pets gone."
When asked by the court whether she had seen M.V. since he had been placed in another foster home, the CASA for M.V. responded: "Yes, I have. I saw him on two nights ago. He was not as gregarious as I have observed him at Tina's house.... [¶] He was a little more withdrawn ...."
At the end of the hearing, the court stated the following: "When I look at these photographs and know that there was a prior injury to a child by this same animal, I can do nothing but grant the motion." The court also terminated the de facto parent status of Tina. The court did not specify the standard of proof used in evaluating the merits of the motion. The form for the findings contains a box next to each of the following statements: "After hearing evidence, the Court determines by a preponderance of the evidence, that the allegations of the Petition are true." "After hearing evidence, the Court determines by clear and convincing evidence, that the allegations of the Petition are true." No check mark was entered in either of the boxes adjacent to the foregoing statements.
On December 8, 2005, the foster parents filed a timely notice of appeal.

DISCUSSION
Foster parents argue that reversal is required because the juvenile court did not *330 set forth the standard or proof it used when making its decision. They maintain that the court should have required agency to prove its case by clear and convincing evidence. Agency concedes that the court never specified the standard of proof it used when assessing the evidence, but it insists the proper standard is preponderance of the evidence, not clear and convincing evidence. Additionally, foster parents contend that, even if reversal is not automatic because of the lower court's failure to specify the standard of proof it used, the court abused its discretion in granting the modification petition. We first determine the proper standard of proof the lower court should have used and then we consider whether it abused its discretion when it panted agency's section 388 motion.

I. Standard of Proof

Under section 388, various parties, including the agency, may petition the court to change, modify or set aside a previous court order on the grounds of changed circumstances or new evidence. (§ 388, subd. (a).)[5] The petition shall set forth why the requested modification is in the best interests of the dependent child. (§ 388, subd. (b).)[6]
Foster parents acknowledge that ordinarily the moving party for a section 388 motion has the burden of establishing by a preponderance of the evidence that a change of circumstances exists and that the proposed change is in the child's best interests. (In re Casey D. (1999) 70 Cal. App.4th 38, 47, 82 Cal.Rptr.2d 426.) However, foster parents argue that when the moving party is a governmental agency that is seeking to remove the child from the child's home, the moving party has the burden of establishing the case by clear and convincing evidence. (See In re Michael D. (1996) 51 Cal.App.4th 1074, 59 Cal.Rptr.2d 575.) Foster parents argue that, since the agency is seeking to remove M.V. from their home, the hearing is like a dispositional hearing and the higher standard applies (see § 361, subd. (c)).
When arguing for a heightened burden of proof, foster parents rely on the reasoning of In re Michael D., supra, 51 Cal. App.4th 1074, 59 Cal.Rptr.2d 575. The court in In re Michael D. at page 1084, 59 Cal.Rptr.2d 575, noted that the heightened standard applies when removing a child from the child's home under section 361, subdivision (c). Similarly, the court pointed out (In re Michael D., supra, at p. 1084, 59 Cal.Rptr.2d 575) that rule 1432 of the California Rules of Court, which outlines the procedures to implement section 388, *331 provides: "The petitioner requesting the modification under section 388 has the burden of proof. If the request is for the removal of the child from the child's home, the petitioner must show by clear and convincing evidence that the grounds for removal in section 361(c) exist. If the request is for removal to a more restrictive level of placement, the petitioner must show by clear and convincing evidence that the change is necessary to protect the physical or emotional well-being of the child. All other requests require a preponderance of the evidence to show that the child's welfare requires such a modification." (Cal. Rules of Court, rule 1432(f).)
The court in In re Michael D. concluded: "When the governmental agency petitions the juvenile court [pursuant to section 388] to modify, change or set aside an earlier order ... by requesting the child be removed from his or her family home, the state is again interjecting itself into private matters. By parity of reasoning, the government should again be required to supply clear and convincing evidence of detriment to the child before a juvenile court is warranted in granting the government's petition to remove the child from his or her home." (In re Michael D., supra, 51 Cal.App.4th at p. 1085, 59 Cal. Rptr.2d 575, fn. omitted.)
Applying the reasoning of In re Michael D. to the present case, foster parents contend that the heightened standard applies because agency was removing M.V. from their home and Tina was M.V.'s de facto parent.[7] We disagree. The reasoning underlying the decision in In re Michael D. supports the application of the preponderance standard to the facts of this case. The court in In re Michael D. concluded that the clear and convincing standard applies when the governmental agency files a petition pursuant to section 388 to remove the child from the parent's home because "[a]t the dispositional hearing, and at each review hearing prior to permanency planning, there is a statutory presumption the child will be returned to parental custody." (In re Michael D., supra, 51 Cal.App.4th at p. 1086, 59 Cal.Rptr.2d 575.) No such statutory presumption applies to de facto parents and the court in In re Michael D. does not suggest that the heightened standard applies when the dependent child is being removed from a de facto parent's home.
Similarly, section 361, the statute upon which the court in In re Michael D. relies when setting forth the limited circumstances when a section 388 petition involves the heightened standard of proof, does not refer to de facto parents. Rather, section 361, subdivision (c) provides in pertinent part: "A dependent child may not be taken from the physical custody of his or her parents or guardian or guardians with whom the child resides at the time the petition was initiated, unless the juvenile court finds clear and convincing evidence of any of the following: [¶] (1) There is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's or guardian's physical custody."
A de facto parent does not have the same rights as a parent or a legal guardian. *332 (In re P.L. (2005) 134 Cal.App.4th 1357, 1361, 37 Cal.Rptr.3d 6.) De facto parents have only the right to be present at the hearing, be represented by counsel, and present evidence. (Cal. Rules of Court, rule 1412(e); In re Brandon M. (1997) 54 Cal.App.4th 1387, 1394, 63 Cal. Rptr.2d 671; In re Guardianship of Z.C.W. (1999) 71 Cal.App.4th 524, 528, 84 Cal.Rptr.2d 48.) While de facto parents are given an opportunity to participate in the proceedings, that status does not confer on them the right to continued placement of the dependent child in their home. (In re P.L., supra, at p. 1361, 37 Cal. Rptr.3d 6.) Accordingly, the clear and convincing standard is applied to protect the rights of parents and guardians, but it is applied to no one: else.
We therefore conclude that the agency's burden of proof at the section 388 modification hearing was to establish its case by a preponderance of the evidence.

II. Granting the Section 388 Petition

The burden on the agency in the lower court was to establish by a preponderance of the evidence that a change of circumstances existed and the proposed change was in the child's best interests. (In re Casey D. (1999) 70 Cal.App.4th 38, 47, 82 Cal.Rptr.2d 426.) Rulings on section 388 motions are reviewed for abuse of discretion. (In re Stephanie M. (1994) 7 Cal.4th 295, 318, 27 Cal.Rptr.2d 595, 867 P.2d 706.)
In the present case, the lower court's findings are inadequate. Not only does the court not specify the burden of proof it used, it does not even indicate that it imposed the burden of proof on the agency. Further, the court's sole findings are the following: "When I look at these photographs and know that there was a prior injury to a child by this same animal, I can do nothing but grant the motion." In the written order, the court simply writes that the section 388 motion is granted.
We accept the court's factual findings and all reasonable inferences supporting them. (In re Heather A (1996) 52 Cal. App.4th 183, 193, 60 Cal.Rptr.2d 315.) However, the findings before us are not sufficient to support a finding of changed circumstances or a finding that the proposed change was in M.V.'s best interests. Our conclusion is bolstered by the absence of any indication on the record that the court understood the necessity of finding that the agency had the burden of proving by a preponderance of the evidence that changed circumstances existed and that the proposed change was in M.V.'s best interests.
Agency argues that the four photographs of M.V. that showed his injuries from the dog supported an implied finding that the allegations in the section 388 petition were true. Agency maintains that it established a change of circumstances by presenting evidence that the foster parents' dog injured M.V. Agency asserts that "just a peek at the photographs, coupled with the foster father's reticence to admit that the dog had previously bitten their son, ... clearly demonstrated that it was in [M.V.'s] best interest to change his placement."
The parties stipulated to the fact that the foster parents' dog injured M.V. However, neither the court nor the photographs addresses other critical evidence in the record. At the section 388 hearing, the foster parents asserted that they recognized they had made a serious mistake in leaving M.V. alone with the dog and their 14-year-old daughter. B.F. asserted that they planned to find a new home for the dog and Tina claimed that they had *333 removed the animals from the home.[8] We cannot tell from this record whether the lower court failed to consider this critical evidence or whether it did not believe the testimony. If the latter, without any statement by the court to explain its reasoning, we cannot determine whether it abused its discretion in making such a finding.
Since the undisputed evidence establishes that the foster parents were willing to remove the dog,[9] and it was the danger posed by the dog that prompted agency to file the section 388 petition, it would appear that the changed circumstances posing a threat to M.V. had been ameliorated. The evidence in the record indicated that the foster parents had otherwise been responsible. The CASA for M.V. asserted that she did not believe foster parents exhibited a lack of judgment regarding M.V. in any other area. She stated: "And I feel that even though this does reflect a lack of judgment around the issue of pets, I am not sure whether that can be extended, from what I have seen of them, to imply that we have a lack of judgment about other areas of his safety. As I have directly seen them be very careful in other areas, like safety gates or making sureso he's always being watched, [¶] So I feel if the pets aren't there, and that was the area in which the lack of judgment occurred, then their place would be safe for him to be returned. [¶] ... [¶] But from his perspective, he's going to be best served in their house with the pets gone."
In reviewing this record, we recognize the real danger that the dog posed to M.V. There have been too many cases of children, and even adults, being seriously injured or killed by dogs. We therefore are not minimizing the danger the dog posed to M.V., who was far too young to know how to act responsibly with an animal or to protect himself against an animal. However, as already stressed, the foster parentsalthough they may have minimized the injuries suffered by their son and M.V. from the dogrecognized that the dog could not remain in the home. There is no evidence contradicting their statements that the dog would not remain in the home.
Given that the foster parents were willing to remove the dog and we cannot tell from the record that the court distrusted this testimony, the critical question before the court was to determine whether removing M.V. from the foster parents' home served M.V.'s best interests. The lower court's findings provide no information on this critical issue. As already stressed, it may be that the court decided that removal was in M.V.'s best interests because, even with the dog out of the home, the foster parents' tendency to minimize the injuries from the dog and their failure to appreciate the significance of the prior injuries posed a risk to the child. However, there is nothing in this record to establish that the court even considered what was in the child's best interests.
We are especially concerned because both the CASA and counsel for M.V. recommended that M.V. remain in the foster parents' home as long as the dog was removed. Indeed, both expressed concern for the psychological damage that M.V. might suffer as a result of being separated from the foster family. Both the CASA *334 and the attorney for M.V. had visited M.V. in the new foster home. They both, independently, expressed concern that he had become withdrawn and both opined that he had bonded with the foster parents and wanted to remain with them. There is nothing in this record to indicate that the lower court even grappled with the assessments of the CASA and attorney for M.V. and the consequences of severing the bond between M.V. and the foster parents and the bond between M.V. and the foster parents' children.
The court's inadequate findings do not permit meaningful appellate review of its order granting agency's section 388 motion. Another complication is that so much time has lapsed between the removal of M.V. from the foster parents' home and our review of the order. We are reviewing this section 388 order more than one year after M.V. has been removed from the home of Tina and B.F. At this point, M.V. has probably already suffered psychological trauma from being separated from the foster parents' family and it may not be in his best interests to remove him from his current placement and return him to the foster parents' home. Thus, the juvenile court will need to consider evidence regarding M.V.'s current situation.
In this very troubling case, it appears that many people have let young M.V. down. His biological parents let him down and he was removed from their care at the age of five months. Subsequently, his foster parents did not appreciate the danger their dog posed to him and they let him down by not adequately protecting him from the dog. The juvenile court let him down by not making the appropriate findings and by not making it clear in its findings that it considered the bond M.V. had developed with Tina and B.F. and their children.
Finally, the appellate process let M.V. down. In a juvenile dependency case that involves a young child's out-of-home placement, it is obvious that time is of the essence. The juvenile court issued its order removing M.V. from the foster parents' home on October 28, 2005. Foster parents filed their notice of appeal on December 8, 2005. Foster parents apparently retained their own counsel who withdrew and this court granted the request for appointed counsel on May 4, 2006. The opening brief was not filed until August 24, 2006, and the case did not become fully briefed until the middle of November 2006. Thus, we are now reviewing this order more than one year after M.V. has been removed from the foster parents' home; thus, M.V. has been living in a different placement for over one year. Such a delay seriously hampers this court's ability to ensure that M.V.'s best interests are protected.
Although the lapse of time may, in itself, require the lower court to rule that M.V. should not return to the foster parents' home, we reverse the section 388 order and remand for the lower court to make the appropriate findings and to hold any hearing that is necessary. The court is to make specific findings to permit a reasonable review of its ruling. The findings are to address the foster parents' assertion that the dog was removed from the home as well as M.V.'s current circumstances.

DISPOSITION
The section 388 order is reversed. The matter is remanded for further proceedings consistent with the views expressed in this opinion, and with consideration of M.V.'s current circumstances.
We concur: KLINE, P.J., and RICHMAN, J.
NOTES
[1] All further unspecified code sections refer to the Welfare and Institutions Code.
[2] The medical report stated that M.V. suffered a "dog bite/scratch" but the parties stipulated that the wound appeared to be a bite.
[3] The court has not terminated the parental rights of the biological mother and biological father.
[4] B.F. testified that they needed to find a new home for the dog while Tina testified that the animals were gone. At the time of the section 388 hearing, the clog was not in the home. It had been quarantined by the animal shelter. The dog was quarantined on October 24, 2005, and it was due to be released on October 30, 2005.
[5] Section 388, subdivision (a) provides: "(a) Any parent or other person having an interest in a child who is a dependent child of the juvenile court or the child himself or herself through a properly appointed guardian may, upon grounds of change of circumstance or new evidence, petition the court in the same action in which the child was found to be a dependent child of the juvenile court or in which a guardianship was ordered pursuant to Section 360 for a hearing to change, modify, or set aside any order of court previously made or to terminate the jurisdiction of the court. The petition shall be verified and, if made by a person other than the child, shall state the petitioner's relationship to or interest in the child and shall set forth in concise language any change of circumstance or new evidence which are alleged to require the change of order or termination of jurisdiction."
[6] Section 388, subdivision (b) reads: "(b) Any person ... may petition the court to ... make any other request for an order which may be shown to be in the best interest of the dependent child.... The petition shall be verified and shall set forth the following: [¶] ... [¶] (3) The request or order that the petitioner is seeking. [¶] (4) Why that request or order is in the best interest of the dependent child."
[7] "`De facto parent' means a person who has been found by the court to have assumed, on a day-to-day basis, the role of parent, fulfilling both the child's physical and psychological needs for care and affection, and who has assumed that role for a substantial period. ..." (Cal. Rules of Court, rule 1401(a)(8).)
[8] At the time of the hearing, the dog was being quarantined by the animal shelter.
[9] As discussed ante, it may well be that the court had reason not to believe the testimony that the foster parents would remove the dog from the home or the court may have concluded that exposing M.V. to the dog exhibited such bad judgment that returning M.V. to the home posed too great a risk to M.V.'s well-being. However, the court's findings state nothing about the promise not to have the dog in the home.