Filed 6/26/14  In re Destiny M. CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re DESTINY M., a Person Coming Under the Juvenile Court Law. | B251953 |
| | (Los Angeles County Super. Ct. No. CK90378) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | |
| Plaintiff and Respondent, | |
| v. | |
| LESLIE M., | |
| Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Jacqueline H. Lewis, Judge.  Affirmed.

Robert R. Walmsley, under appointment by the Court of Appeal, for Defendant and Appellant.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, and John C. Savittieri, Deputy County Counsel, for Plaintiff and Respondent.

Leslie M. (mother) appeals from orders of the juvenile court (1) denying her Welfare and Institutions Code section 388 petition to return her daughter or, in the alternative, reinstate her visitation and reunification services, and (2) terminating her parental rights.[1] We find no abuse of discretion, and thus we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Mother has three children: Desiree W. (born Aug. 1995), Giselle N. (born Oct. 2000), and Destiny M. (born Jan. 2008). Francisco A. (Francisco) is Destiny's father; Desiree and Giselle both have different fathers. This appeal relates to the juvenile court's orders regarding Destiny only.

## I.     Detention

In October 2011, the family came to the attention of the Los Angeles Department of Children and Family Services (DCFS) when Desiree, then 16 years old, reported that Francisco had touched her inappropriately on the buttocks, breast, and legs 20 to 30 times. Desiree said she had told mother about the incidents but mother did not believe her. Desiree also reported that mother was on probation for drug sales and that she and mother had used methamphetamines and marijuana together.

A police officer interviewed mother and maternal grandmother. Maternal grandmother denied that the children were ever left alone with Francisco. She said mother smoked marijuana in front of the children but did not use drugs with them. Mother admitted she was addicted to methamphetamines, but said she was in counseling for her addiction. She admitted to smoking marijuana in front of the children and to using drugs a day earlier. She also admitted Desiree had told her about the sexual abuse;

---

[1]     All further statutory references are to the Welfare and Institutions Code.

2

she said she confronted Francisco, but he denied it. Following these interviews, DCFS detained Desiree and Destiny.[2]

Desiree told a children's social worker (CSW) that Francisco touched her breast or buttocks whenever he could, and sometimes had rubbed her legs or attempted to kiss her on the mouth. When Desiree told mother about Francisco's abuse, mother said she could not confront Francisco because he paid the rent. In December 2010, mother and Desiree used methamphetamines and marijuana together. Mother and Desiree continued to smoke marijuana together on a daily basis for five months. Desiree believed mother continued to use methamphetamines.

Mother told the CSW that she had been sexually abused as a child by an adult brother. She did not believe Francisco molested Desiree and said Desiree was a very defiant child who would say anything to get her way. Mother admitted that in 2011, she had been convicted of possession and sale of a controlled substance and ordered to register as a drug offender and to complete a drug diversion program. She was required to drug test on a regular basis and had one dirty test since enrolling in the program.

At a detention hearing October 18, 2011, the court found a prima facie case for detaining the children, ordered DCFS to provide mother and Francisco with reunification services, and granted mother and Francisco monitored visitation with Destiny.

## II.    Petition

DCFS filed a juvenile dependency petition on October 18, 2011. It alleged: (b-1, j-1) On numerous prior occasions, Francisco made sexualized remarks and overtures to Desiree, including placing his head in her lap and touching parts of her body, creating a detrimental home environment for all three children and placing them at risk of harm; and (b-2) Mother has an unresolved history of substance abuse, including methamphetamines

---

[2]    Giselle was living with her father and was not detained.

and marijuana, which periodically interferes with her ability to provide regular care for the children, and has made marijuana available to Desiree.[3]

## III.     Jurisdiction and Disposition

### A.     *Jurisdiction and Disposition Report*

In November 2011, Desiree told a dependency investigator (DI) that Francisco often fondled her breasts and buttocks, but she could not recall specific dates when the abuse occurred. Desiree said, "He [Francisco] has actually told me that he desires me and asked me if I wanted to have sex." Francisco sometimes asked Desiree if she needed cigarettes or marijuana and sometimes bought marijuana for her. In October 2011, Desiree told her aunt about the sexual abuse, and her aunt advised Desiree to tell mother. Desiree did, and mother told Francisco, "If you ever touch my daughter [we're] going to have problems." Desiree thought mother believed Francisco was abusing her but did not do anything about it. She said she lied about mother using drugs with her because she was upset with mother.

Giselle reported enjoying weekend visits with mother and her sisters. She said Francisco was a nice person and had never touched her sexually. She believed Desiree was lying about the sexual abuse because "[Francisco] wouldn't do that to her." She said mother had used drugs in the past, but she did not think mother was using now. Giselle's father said he had never seen mother use drugs and had no information about Francisco's alleged sexual abuse of Desiree.

Mother said she did not believe Francisco was sexually abusing Desiree. Moreover, she was reluctant to confront Francisco because "[h]e financially supports me" and "he has a bad temper and gets mad." Mother was not working and did not know how she would pay her rent if she broke up with Francisco. She said in the past she had kicked Francisco out of the house, but she had allowed him to return because she did not want Destiny to grow up without a father.

---

**3**     Additional allegations were not sustained and are not relevant to this appeal.

4

Mother admitted to a history of drug use. She said she started using marijuana at age 14 and methamphetamines at age 19. Her addiction worsened after 2007. Mother said she could care for Destiny while on methamphetamines, but not when she was "crashing." After her arrest in 2011 for drug possession, she entered a drug treatment program, from which she recently had graduated. Mother said she had not used drugs since she enrolled in the drug treatment program five months earlier and never gave Desiree drugs, but she admitted smoking marijuana with Desiree twice.

Francisco denied touching Desiree sexually. Since mother told him of Desiree's allegations, he had tried to distance himself from her. He admitted asking Desiree to tell her friends that they were beautiful, but said he was only joking. He also admitted talking to Desiree about past relationships with other women.

Mother's drug treatment counselor said mother had a mature attitude about treatment and participated fully in the program. Mother admitted to having an unhealthy relationship with Francisco.

Based on the foregoing, DCFS recommended that the petition be sustained, the children be removed from mother, and mother's and Francisco's visits with Destiny be monitored.

### B. Interim Review Report

DCFS filed an interim review report dated February 22, 2012. It said that on January 20, 2012, Desiree had recanted her sexual abuse allegations during an interview with a DI. She said Francisco never touched her sexually, but she had reported sexual abuse because "I didn't like the way he was treating my mom, but I know that people change and he's probably treating her (mother) better." Desiree also said she never told her aunt that Francisco touched her sexually; when told that her aunt said Desiree had reported sexual abuse to her, Desiree said she had lied to her aunt.

On January 20, 2012, Desiree reported that someone, possibly her foster father, had watched her through a window while she showered. She could not say why she thought it was her foster father; later, she said it could have been a tree branch.

5

DCFS advised the court that Desiree had recanted her previous reports of child abuse, but said that "although the child is indicating that the sexual abuse allegations are not true, the child may have been influenced to change her statements based on her contact with her mother. The foster mother reported to DI that there are times during the visit that she has to remind the mother not to discuss the case issues with the child. Further although the child is denying that [Francisco] sexually touched her breast and butt, it appears that [Francisco] was inappropriate with his actions in that he admits to being inappropriate by laying his head on child Desiree's lap and allowed her to caress his head. Further [Francisco] also admits to engaging in inappropriate conversations with child Desiree making comments to her about the women in his past that he was having sex with and providing her details. . . . This type of behavior from an older man is the behavior of a predator that is trying to groom his victim. [Francisco's] actions were inappropriate and are indicative of a person making sexual advances at a child. [¶] . . . [¶] In addition, the court is informed that the child appears to [be] experiencing hyper vigilant behaviors as disclosed in the month of January that she thought her foster father in her current placement was peeking through the window while she was showering. . . . It appears that the child's behaviors are indicative of being a victim and the trauma appears to be surfacing from past experiences and or potentially being a victim of sexual abuse or inappropriate conduct by [Francisco]. Despite the child recanting her statements the Department finds that [Francisco's] behaviors were inappropriate in which he crossed boundaries in attempts to groom the child for victimization of sexual abuse."

Mother had two negative drug tests on January 3 and 9, 2012.

### C.    Hearing

On February 22, 2012, the court found that mother and Francisco knowingly waived their rights to trial on the allegations of the petition. The court sustained paragraphs b-1, b-2, and j-1, and dismissed paragraphs b-3, b-4, d-1, and j-2. The court declared Destiny a dependent child pursuant to section 300, subdivisions (b) and (j). It ordered mother to participate in individual counseling, parenting classes, alcohol and

6

drug counseling, a 12-step program, and random drug testing, and granted mother and Francisco monitored visitation with Destiny.

## IV. Six-Month Review

DCFS filed an interim review report on April 18, 2012. It stated that mother was in contact with her CSW and in compliance with her case plan. Mother had completed drug and alcohol education on November 18, 2011, and was attending a relapse prevention program and individual counseling. Mother did not show up for drug testing on March 6, 2012, and tested negative on March 16, 2012.

A status review report dated August 29, 2012, stated that mother and Francisco had been visiting Destiny two hours per week. Visits "have gone well and parents interact and play with child Destiny, Destiny interact[s] with parents well and does not show any fear around her parents." Mother had been given an additional day each week to visit with Destiny, and Destiny and Desiree had sibling visitation twice per month. Mother reported having learned a lot from her parenting classes and said she wanted to live a drug-free lifestyle and focus on her children's needs. Mother tested negative for drugs seven times between April and August, and failed to show up for testing twice. DCFS reported mother was in compliance with her case plan and court orders, and recommended that Destiny remain a dependent of the court.

Attachments to the report showed that mother had successfully completed 12 individual mental health counseling sessions, at which she "was motivated towards therapy and positive change" and "showed growth throughout therapy." Mother also had attended ten 12-step meetings and completed a parenting class and drug and alcohol education.

At the August 29, 2012 hearing, the court found that mother had made "moderate" progress towards reunification and granted her four- to six-hour unmonitored visits with the children each week. Francisco's visits with Destiny remained monitored. The court also advised that if the children could not be returned home by the 12-month hearing,

7

reunification services could be terminated and the case referred for a permanent plan of adoption or long-term foster care.

## V. 12-Month Review

DCFS filed a status review report on March 6, 2013. It stated that on September 26, 2012, the CSW made an unannounced visit to mother's apartment and saw Francisco standing outside the apartment. Mother was asleep in the apartment; Francisco entered the apartment and woke her up. In the apartment, the CSW saw pillows on the floor and the television on. Francisco said he was not living with mother, but she was accompanying him to an appointment that day.

In December 2012, Desiree told the CSW that Francisco was present during her unmonitored visits with mother and she believed Francisco was living with mother. When the CSW asked mother about the issue, mother initially said Francisco was there to lend her his car, but then admitted that Francisco had been present in the home during her visit with both children. She claimed that was the first time Francisco had been present during a visit. The CSW told mother she had violated the court's order and further visits would be monitored.

In February 2013, mother told the CSW that since Francisco helps her pay her rent, she felt he had the right to be around. Mother said Francisco did not live with her, but came over occasionally to shower or to eat. Francisco reported he was living in his car, but occasionally ate and showered at mother's apartment or spent the night there.

Between September 2012 and February 2013, mother had 10 negative drug tests and failed to show up once. Mother said she had missed the test because of a mix-up with the testing site.

DCFS concluded that although mother had completed court-ordered programs, it remained concerned about the children's safety and well-being. It recommended that the children remain court dependents and mother continue to receive reunification services.

The court held a contested hearing on April 4, 2013. Mother testified that she had abused drugs for 15 years, but had been sober for the last two years. She said she had

learned to recognize some of the things that had triggered her past drug use and had addressed them. Mother also said she had had difficulty disengaging with Francisco because of her financial situation. Mother had been working only part time and so was dependent on Francisco to pay her rent. A month earlier, however, mother told Francisco, "I'm no longer going to be accepting any money from [you] . . . . I'm going to try doing it on my own, and just please leave me alone." Mother had been motivated to change her relationship with Francisco because DCFS was "going to terminate my reunification services. And my priorities have shifted. My priorities are my girls, and my intentions are to gain my girls back, to get [them] . . . back with me to my house, to my home. If I have to lose — if I lose my apartment or whatever, I'm going to do whatever it takes for me to get my girls back."

Mother said she now recognized that it was inappropriate to let Francisco eat or shower at her house "[b]ecause of what he did to my daughter." Mother said she believed Francisco had sexually abused Desiree, and said she was learning through her counseling about sexual abuse and setting boundaries. Mother said that as a result of ending her relationship with Francisco, "I feel more free. I feel more independent. I'm not worried about, you know — I'm not worried about him calling me or — or asking me where I'm going or anything like that. I — I do what I need to do."

County counsel submitted on DCFS's recommendation to continue reunification services. Destiny's counsel asked the court to terminate reunification services. Desiree asked to be returned to her mother's care, and mother asked to have both children returned to her care.

The court found continued jurisdiction necessary. Further, it found by a preponderance of the evidence that returning the children to the parents' physical custody would create a substantial risk of detriment, and by clear and convincing evidence that mother had made only partial progress towards alleviating or mitigating the causes necessitating removal. It explained as follows:

"I think I indicated, during the questioning of mother, that the Court's issue here is not mother's participation in regards to the drug — the substance abuse issues. She's completed a program, seems to be doing well.

"The issue really is her willingness and ability to protect the children from people in their lives that wish to harm them. It's — [counsel] believes that mother is starting to get it. I do not. . . . If . . . mother didn't get over the last . . . 18 months that she shouldn't be anywhere around this gentleman because he molested her daughter, that's what she needs to get, regardless of the economic issues, regardless of needing to take a bus versus having a car, regardless of any of those things. That's the issue.

"It's not about whether the Court prohibits it. It's not about whether or not the Court's going to terminate reunification. It's about, frankly, not putting Desiree in any position to see this man. It's about not wanting to be anywhere around him because he molested your daughter. That's what it's about.

"And I — I do not agree with [counsel] that mother has gotten that at this point, or has even started getting that at this point, after 18 months of reunification services. I appreciate that she says she believes Desiree. I'm glad, for Desiree's perspective, that the mother is believing her. So that is one change since the beginning. But in regards to her willingness and ability to protect Desiree or Destiny, we're nowhere. And, therefore, mother has not made substantive progress in the court-ordered treatment. And that is prima facie evidence that return would be detrimental."

Based on the above findings, the court terminated reunification services and set a section 366.26 hearing as to Destiny.

## VI.    Denial of Mother's Section 388 Petition and Termination of Mother's Parental Rights

On August 12, 2013, mother filed a section 388 petition seeking Destiny's return home or, in the alternative, unmonitored visitation and restoration of reunification services. The court set the matter for hearing.

DCFS filed a section 366.26 report dated August 13, 2013. It stated that Destiny had been living with her foster parents since October 2011. They had nurtured and bonded with Destiny and wanted to adopt her. DCFS recommended that the court terminate mother's and Francisco's parental rights and release Destiny for adoption.

DCFS filed an addendum report dated October 1, 2013. It stated that on May 2, 2013, mother told the CSW she had had no contact with Francisco since the March hearing. However, when mother picked up her bus pass on June 7, Francisco was driving the car in which mother arrived. On September 18, 2013, the CSW made an unannounced visit to mother's apartment and saw Francisco's car parked nearby. In a closet in mother's apartment, the CSW saw two men's shirts, which mother said belonged to her sister. The CSW also saw five toothbrushes in the bathroom, which mother said belonged to relatives who sometimes slept over. DCFS recommended that mother's section 388 petition be denied and Destiny remain a juvenile court dependent.

The court held a contested hearing on October 1 and 2, 2013. Mother testified that she had been sexually abused as a young child and had turned to drugs to numb her pain. Because of her drug use, she had not been aware that Francisco was sexually abusing Desiree. Having her kids taken away had "opened [her] eyes" to the severity of her drug use and motivated her to get help. As of the hearing date, mother said she had not used drugs for about two years. Mother said she also had learned that relationships are unhealthy if "the man that supposedly loves you is always hurting your feelings, making you feel like you're nothing, yelling at you, putting — you know, pretty much just giving you no support whatsoever on anything that you — that you want to do." Mother said her relationship with Francisco had been unhealthy and Francisco "disgusts me" because of what he did to Desiree.

Mother said she was currently working two jobs and, as a result, had not been financially dependent on Francisco since March 2013. She had not seen him since the March court date. She was visiting Destiny every two weeks, and Destiny frequently said she missed mother and asked when she could come home. Mother said that if she were given the opportunity to reunify with Destiny, she would protect her by "making sure

11

who am I bringing around my kids, around my home to begin with. . . . The only people that would be coming to — around my children would be my family, which is my sisters, my father, and my mom, and my cousins when they come around sometimes." She also said she had made important changes since the April court date because she no longer was financially dependent on Francisco for anything: "[S]ome people take — take longer to — to get back on their feet than others. For me it took me this long, and I'm happy to say that I've done it."

Mother said she had attended 12-step meetings for about a year. She said she learned through her 12-step program "to know that I don't need to use to . . . feel good, that I can live [a] normal life without using." However, mother could not recall any of the 12 steps and had last been to a meeting three or four months earlier. She had last spoken to her sponsor about two weeks earlier.

Following mother's testimony, the court denied the section 388 petition. It explained: "I have similar concerns as [Destiny's counsel] in regards to the sobriety issues. But my bigger concerns are in regards to the perpetrator of sexual abuse, who I am not at all convinced is out of the picture. And, you know, frankly, as I heard mother testify, the only thing that could go through my head is that she basically sold her daughter while she continued to have contact with this gentleman after knowing he had sexually abused . . . her daughter, and she continued to use him to pay her rent. I don't know how else you describe — and bring him to visits.

"I'm not sure how else to describe it at that point. She knew [she] was sexually abused. She continued to have contact with him and bring him to visits on condition he paid her rent. Sounds like a sale to me.

"And Destiny is four. She spent half of her life out of her mother's care and custody at this point. She is in a stable home. After hearing this 388, I wouldn't even be ready to give mother unmonitored visits over two years into this case, never mind return."

Based on the foregoing, the court found there was no change of circumstances and it was not in Destiny's best interests to grant the relief mother requested. It therefore denied the section 388 petition. The court also found that continued jurisdiction was

12

necessary and that it would be detrimental to return Destiny to her parents.  Finally, it found by clear and convincing evidence that Destiny was adoptable and that any incidental benefit to Destiny of visiting mother was far outweighed by the benefit to her of a stable and permanent adoptive home.  The court therefore terminated mother's and Francisco's parental rights and ordered DCFS to proceed with Destiny's adoption.

Mother timely appealed from the court's October 2, 2013 findings and orders.

**DISCUSSION**

**I.      Applicable Legal Standards**

Section 388 allows interested parties to petition for a hearing to change or set aside a prior court order on the grounds of "change of circumstance or new evidence."  (§ 388, subd. (a)(1).)  "The burden of proof at any such hearing is on the moving party to show by a preponderance of the evidence both that there are changed circumstances or new evidence and that also a change in court order would be in the best interest of the child.  (§ 388, subd. (b); *In re Stephanie M*. [(1994)] 7 Cal.4th [295,] 317; *In re M.V*. (2006) 146 Cal.App.4th 1048, 1059.)"  (*In re D.B.* (2013) 217 Cal.App.4th 1080, 1089.)

Section 388 "provides the 'escape mechanism' that . . . must be built into the process to allow the court to consider new information."  (*In re Marilyn H*. (1993) 5 Cal.4th 295, 309.)  However, after the termination of reunification services, "the parents' interest in the care, custody and companionship of the child are no longer paramount.  Rather, at this point 'the focus shifts to the needs of the child for permanency and stability' (*In re Marilyn H*., *supra*, 5 Cal.4th [at p.] 309), and in fact, there is a rebuttable presumption that continued foster care is in the best interests of the child.  (*Id*., at p. 302.)  A court hearing a motion for change of placement at this stage of the proceedings must recognize this shift of focus in determining the ultimate question before it, that is, the best interests of the child."  (*In re Stephanie M*., *supra*, 7 Cal.4th at p. 317.)  Further, in seeking an order under section 388 "[i]t is not enough for a parent to show *just* a genuine change of circumstances under the statute.  The parent must show that the undoing of the

13

prior order would be in the best interests of the child." (*In re Kimberly F*. (1997) 56 Cal.App.4th 519, 529.)

A ruling on a section 388 petition "is 'committed to the sound discretion of the juvenile court, and the trial court's ruling should not be disturbed on appeal unless an abuse of discretion is clearly established. [Citations.]' (*In re Stephanie M*.[, *supra*,] 7 Cal.4th [at p.] 318.)" (*In re D.B.*, *supra*, 217 Cal.App.4th at pp. 1088-1089.) "As one court has stated, when a court has made a custody determination in a dependency proceeding, '"a reviewing court will not disturb that decision unless the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination [citations]."' (*In re Geoffrey G*. (1979) 98 Cal.App.3d 412, 421; see *In re Mark V*. (1986) 177 Cal.App.3d 754, 759 [accord]; see also *Department of Parks & Recreation v. State Personnel Bd*. (1991) 233 Cal.App.3d 813, 831.) . . . 'The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.' (*Walker v. Superior Court* (1991) 53 Cal.3d 257, 272, quoting *Shamblin v. Brattain* (1988) 44 Cal.3d 474, 478-479.)" (*In re Stephanie M.*, *supra*, 7 Cal.4th at pp. 318-319.)

## II.     The Juvenile Court Did Not Abuse Its Discretion by Denying Mother's Section 388 Petition

Mother urges that the juvenile court abused its discretion by denying her section 388 petition because she "demonstrated beyond any doubt that she had completed all that was required of her and more." She notes that she had been drug free for nearly two years, visited her daughter consistently, and had completed the classes and individual counseling required of her. Thus, she says, she presented largely uncontradicted evidence that she completed every component of her reunification plan.

We agree that mother was consistent in her visits with Destiny and completed the classes and counseling required by the case plan. We also agree that mother made great progress in combating her drug addiction, apparently remaining drug free for nearly two

14

years.  As to these aspects of her case plan, mother unquestionably was compliant and we commend her progress.  The juvenile court found, however, that mother had not terminated her relationship with her daughter's abuser or demonstrated a commitment to protecting her children from future sexual abuse, findings that were supported by substantial evidence.  The court therefore was well within its discretion in denying mother's section 388 petition and terminating her parental rights.

Among mother's responsibilities under her case plan were to "[prevent] any contact between the abuser and your child(ren)," "[p]rotect your child from emotional harm," and "[s]how that you will not permit others to sexually abuse your child(ren)."  Notwithstanding these clear goals, mother continued to allow Francisco to eat, shower, and sleep at her apartment and to support her financially until at least March 2013, 17 months into the reunification period.  Further, mother admitted that she believed Francisco's financial support gave him "a right to be around" her apartment and, as a result, she allowed him to be present during at least one unmonitored visit with Destiny and Desiree in December 2012.  Under these circumstances, substantial evidence supported the juvenile court's conclusion that mother had not demonstrated a "willingness and ability to protect the children from people in their lives that wish to harm them."

Mother contends that the court abused its discretion by refusing to reinstitute reunification services at the October 2013 hearing, noting that she testified without contradiction that she had cut off all contact with Francisco in March 2013, refusing to see him or accept money from him after that time.  The record belies mother's contention.  The CSW reported that Francisco drove mother to the DCFS office to pick up a bus pass in June 2013.  Further, during an unannounced home visit in September 2013, the CSW saw Francisco's car parked near mother's apartment and men's shirts and extra toothbrushes inside mother's apartment.  Mother testified that the car, shirts, and toothbrushes were not Francisco's, but the juvenile court apparently did not believe her, stating at the hearing's conclusion that it was "not at all convinced" that Francisco "is out of the picture."  On appeal, we are bound by the juvenile court's credibility

15

determinations. (E.g., *In re Katelynn Y.* (2012) 209 Cal.App.4th 871, 881 ["When two or more inferences reasonably can be deduced from the facts, we have no authority to reweigh the evidence or substitute our judgment for that of the juvenile court. (*In re Stephanie M.*[, *supra*,] 7 Cal.4th [at pp.] 318-319.)"].) In light of the juvenile court's implied finding that mother continued to have a relationship with Francisco, the trial court's denial of the section 388 petition manifestly was not an abuse of discretion. (E.g., *In re Katelynn Y.*, *supra*, at p. 881 ["We will not disturb the court's determination unless the court has exceeded the limits of legal discretion by making an arbitrary, capricious or patently absurd determination."].)

Mother also contends that the section 388 petition should have been granted to preserve Destiny's sibling relationship with Desiree. We do not agree. Although there was evidence that Desiree had moved back in with mother after reunification services were terminated, mother presented no evidence at the section 388 hearing of the strength of the bond between Destiny and Desiree. Further, although Destiny and Desiree had lived together until their detention in 2011, by October 2013 Destiny had spent nearly as much time living with her prospective adoptive parents as with mother and Desiree and, when interviewed by a CSW, "became visibly concerned at the thought that she may not be able to live with [prospective adoptive parents]." Under these circumstances, the juvenile court was not required to conclude that the sibling bond between Destiny and Desiree was a change of circumstances that supported the grant of mother's section 388 petition.

Finally, mother contends that the juvenile court's cumulative errors in denying mother additional reunification services, failing to consider the sibling bond, and concluding that mother was only in partial compliance with her reunification plan resulted in a miscarriage of justice requiring reversal. Because we have concluded that the juvenile court's findings and orders were not in error, we reject mother's claim of cumulative error.

16

## DISPOSITION

We affirm the juvenile court's October 2, 2013 findings and orders denying mother's section 388 petition and terminating mother's parental rights.

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

EDMON, J.[*]

We concur:

EPSTEIN, P. J.

WILLHITE, J.

---

[*]Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

17