Filed 1/13/16  In re Amir S. CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re AMIR S., <br><br> a Person Coming Under the Juvenile Court Law. | B259445 <br> (Los Angeles County <br> Super. Ct. No. CK79909) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> ARACELI S., <br><br> Defendant and Appellant. | |

APPEAL from an order of the Superior Court for Los Angeles County, Debra Losnick, Commissioner.  Affirmed.

Araceli S., in pro. per., for Defendant and Appellant.

Tarkian & Associates and Arezoo Pichvai for Plaintiff and Respondent.

Araceli S. (Araceli)[1] appeals from a juvenile court order summarily denying her Welfare and Institutions Code[2] section 388 petition seeking to modify a juvenile court placement order. In her petition, Araceli sought to have her nephew, Amir S., removed from his foster caregiver—who wishes to adopt Amir and with whose family the now four-year-old child has lived for over three years—and placed in her care. Araceli's petition was filed over seven months after family reunification services were terminated, 18 months after Amir was removed from parental custody, and almost two-and-one-half years after this dependency proceeding commenced. The essence of Araceli's appellate arguments is that the juvenile court failed to apply the statutory preference for placing a dependent child in the care of a relative. (§ 361.3, subd. (a).) Finding no error, we affirm the court's order.

## BACKGROUND

A thorough discussion of the factual and procedural background of this action is contained in our opinion in an earlier related appeal by Amir's father, *In re Amir S*. (July 6, 2015, B258838) [nonpub. opn.] (*Amir S*.).) We need not repeat those details. We focus here on facts pertinent to this appeal.

Three-month-old Amir and his six-year-old half-sister (not a subject of this appeal) came to the attention of respondent Department of Children and Family Services (DCFS, or the agency) on January 13, 2012, when the agency received a

---

[1]     For the sake of clarity, we will refer to Amir's maternal aunts, Araceli S. and April S., by their first names. We intend no disrespect. Araceli's name is spelled various ways in the record. We adopt the spelling used by Araceli.

[2]     Undesignated statutory are to the Welfare and Institutions Code.

referral regarding allegations of caretaker absence/incapacity and emotional abuse by the children's mother, Shelly S. (mother), who purportedly had tried to commit suicide by overdosing on medication.[3] The following day, a DCFS children's social worker (CSW) met with several of Amir's maternal relatives, including his grandmother and Araceli. The grandmother offered to house Amir and was instructed to attend the detention hearing. There is no indication that Araceli also requested at that time to be considered as a relative placement for her nephew, either in place of or as an alternative to the maternal grandmother in the event that DCFS deemed that placement inappropriate.

Amir was detained on January 19, 2012, after the juvenile court sustained a petition alleging two counts under section 300, subdivision (b), premised on mother's history of substance and alcohol abuse and mental health problems. DCFS' report for the detention hearing noted that Amir had "relatives to consider for placement," but identified only the maternal grandmother (whom DCFS later rejected) as a potential relative placement. Amir's maternal grandmother and maternal aunt April attended the detention hearing. DCFS was ordered to conduct a pre-release investigation (PRI) as to April as a possible relative placement. Amir was placed in foster care, but the court gave DCFS discretion to release him to "any appropriate and approved relative."

In January 2012, DCFS conducted a PRI of April's home as a possible placement for Amir and his sister; the results were not promising. 21-year-old April lived in a one-bedroom apartment and worked full-time. She said she had no

---

[3]     Neither of Amir's parents is a party to this appeal. At the time Amir was detained the whereabouts of his father, N.A. (father), were unknown. DCFS later learned father had been incarcerated and was being held at an ICE detention facility for deportation (although he was later granted asylum).

children of her own and had never provided full-time care for a child. The CSW expressed serious misgivings about April's ability to be the primary caregiver for two young children in light of her age, job commitments and lack of experience caring for children, particularly in light of the fact that the infant Amir would require constant care. April failed to undergo a live-scan and be fingerprinted. After their initial discussions, the CSW made several unsuccessful attempts to contact April. In late January, the maternal grandmother told DCFS there had "been a change of plans" and that April (who actually lived in Utah), was too young and "[couldn't] handle two kids," and the family had decided "not . . . to help [mother]." A February 29, 2012 report prepared after DCFS' multi-disciplinary assessment team (MAT) met with some of Amir's relatives, identified Araceli and a maternal uncle as part of Amir's "child family team." The MAT did not identify Araceli as a potential relative placement for Amir in the event the family was unable to reunify.

Father was released from jail in April 2012 and met with the CSW a few weeks later. He made his first appearance in this action at the disposition hearing in May 2012, at which the court declared him to be Amir's presumed father. By the end of June, when he began monitored visits with Amir, father had obtained work and was renting a room in a house he shared with two families. For several months thereafter, father substantially complied with the case plan and his visits with Amir were increasingly liberalized. In October 2012, Amir was placed in father's custody "on condition that mother not reside . . . and not to be in the father's home at all," and that he not monitor mother's visits with Amir.

In mid-November 2012, Amir was re-detained and placed in the care of the foster mother with whom he remains today. DCFS filed a supplemental petition after learning the parents engaged in a violent altercation in Amir's presence, that father violated the court's order and gave mother access to Amir, and that father

4

might soon be taken into custody for immigration-related reasons. Mother told DCFS she had lived with and supported father and provided care for Amir since the child was placed in father's custody in October. DCFS' detention report stated that Amir had "no relatives to consider for placement." At the re-detention hearing on November 20, 2012, maternal grandmother and April each requested custody of Amir. The court ordered DCFS to conduct another PRI as to April (who was now living in California) as a possible relative placement, and restored father's monitored visitation.

After conducting a PRI, DCFS expressed similar concerns about the ability of April (now 22-years-old and unemployed) to provide adequate care for one-year-old Amir. DCFS also was concerned about the maternal grandmother—with whom April now lived—who had a significant history of reported child abuse and neglect. Mother, who was incarcerated and soon to be deported, told DCFS it would be "fine" if April adopted Amir.[4] The juvenile court ordered DCFS to investigate the possibility of placing Amir with other relatives. No mention was made of a possible placement with Araceli, who had not told DCFS she was interested in taking custody of Amir if reunification efforts failed or April's home was deemed an inappropriate placement.

On December 10, 2012, Araceli and April visited DCFS' office together. The aunts were upset about what the parents did to Amir, and reported that mother had lived upstairs in the same house when Amir lived with father, and had regular

---

**4** There is no evidence that father agreed to such a plan or that either parent made any effort formally to relinquish Amir for adoption. (See Fam. Code, §§ 8604, subd. (a) [setting forth circumstances in which consent of presumed father is required for adoption]; 8700 [setting forth requirements for parents' voluntary relinquishment of child for adoption].)

access to Amir in shared areas of the house. They requested that Amir be placed either with April (who was now working part-time, had her own apartment and was receiving "help" from Araceli), or with "another [unidentified] family member." They did not ask that Amir be placed with Araceli.

In its report for the combined jurisdictional/dispositional hearing on January 15, 2013, DCFS informed the court that April had lied about where she was living and about having no children of her own; she had a two-year-old daughter who lived with her father in Utah. DCFS was unable to approve April as Amir's caregiver because she lacked "good moral character" and was untrustworthy. DCFS also suspected April might be colluding with Amir's mother, or that she might remove Amir from California. The juvenile court sustained the supplemental petition. The court ordered that Amir be placed in foster care but gave DCFS discretion to place him with April, whom the court awarded monitored visitation.

In a February 2013 report, DCFS informed the court that a developmental evaluation of Amir revealed that the child displayed age appropriate skills in all areas, and described him as "an engaging and friendly boy" who had developed a strong attachment to his foster family. April had been consistent in visiting Amir. The child seemed comfortable with April, who was affectionate with and attentive to him during visits, and both the foster mother and CSW had "nothing but positive things to say about [April]." DCFS reported that mother had been or soon would be deported, and that father had not seen the child since his detention in mid-November 2012. In fact, neither parent saw or visited Amir again. DCFS recommended that April adopt Amir. The agency did so with misgivings, however, as the CSW remained concerned about April's past actions and her dishonesty. Nevertheless, DCFS expressed hope that it could "work with [April] to resolve the issues and in the future to trust [her] with Amir's care."

6

In an effort to alleviate its concerns about April's trustworthiness, DCFS recommended that she and Amir participate in joint therapy. That therapy began in mid-April 2013, and April continued weekly visits with Amir. The therapist reported that April was "consistent, attentive [and] affectionate" with Amir during their sessions. At about the same time, however, DCFS received conflicting information from the visitation monitor who said that, although April consistently visited Amir, she did not engage with him during visits (by talking to or playing with him), but just watched him. The monitor also reported that April sometimes brought her own daughter to visits, who was aggressive and hit Amir and took things from him. The monitor was particularly concerned because April made no effort to correct her daughter's behavior. The CSW discussed DCFS' concerns about the inconsistent reports from the therapist and monitor with April, and told her the issues had to be resolved before she could have unmonitored visits with Amir.

The therapist agreed to address DCFS' concerns in sessions with April and her daughter. At first, April made excuses about why her daughter was unable to attend therapy sessions; ultimately, she simply refused to bring her. The CSW explained to April that, although DCFS could not force her to bring her daughter to therapy, the agency wanted her to do so before beginning unmonitored visits with Amir to avoid future problems. Araceli later contacted the CSW and explained that April's ex-husband refused to allow his child to attend therapy and had threatened to seek permanent custody if April took their daughter to therapy. Araceli told the CSW that April had a right to refuse to take her daughter, who was not a subject of this dependency action, to therapy. On August 7, 2013, the CSW received a telephonic message from the maternal grandmother stating that the family "had been doing things [DCFS'] way but this was discrimination," and they planned to sue the CSW and DCFS.

7

In mid-August, the monitor told DCFS that it had been three weeks since April last visited or attended therapy with Amir. Further, when April did show up for visits, she had a flat affect and did not engage with Amir. The monitor also noted that Araceli, who had accompanied April at visits, "seemed to be very interested in Amir and . . . was good with" him. The monitor believed it was actually Araceli who wanted custody of Amir. However, because Araceli had a pending dependency case, she was unable to "get" Amir so she was pushing "April to get him instead." DCFS informed the juvenile court that both April and Amir's foster caregiver wished to adopt the child. Due to unresolved concerns about April's sincerity, the CSW believed that adoption of Amir by the foster mother was the best permanent plan. DCFS recommended that the juvenile court terminate reunification services and set the matter for a section 366.26 hearing for a permanent plan of adoption or legal guardianship.

In an interim report in early October 2013, DCFS informed that court that April had not visited Amir for over a month. At first, the monitor had let Araceli continue to visit him alone, but had stopped doing so. The foster mother told DCFS that neither April nor Araceli had ever called to see how Amir was doing. DCFS said it had worked for 18 months with April to develop a permanent plan. Although it continued to do so, the agency had ongoing concerns about whether the family had been deceptive and was using April as a proxy for Araceli, and about April's truthfulness, character and ability to provide a safe, loving home for Amir. DCFS opined that it was in Amir's best interest to be adopted by his foster parent, with whom he had now lived for about one year. On October 3, 2013, the juvenile court terminated reunification services, and set the matter for a section 366.26 hearing on January 30, 2014, continued several times to August 21, 2014.

In reports submitted in connection with the section 366.26 hearing, DCFS informed the court that Amir continued to thrive in his foster home, had

8

"developed a significant relationship" with his caregiver and her son, and was "very emotionally bonded" to the caregiver's family with whom the now two-year-old had lived for half his life. DCFS described interactions between Amir and his foster mother and her son as "loving" interactions "of a mother and son and brother to brother." The caregiver wanted to adopt Amir. DCFS recommended that parental rights be terminated, and that Amir be placed for adoption once the caregiver's home study was complete.

On April 28, 2014, Araceli filed a section 388 petition. On that petition, she checked a box indicating she was seeking to change a juvenile court order, but did not specify the order she wanted modified. Attached to the petition was a letter from Araceli saying she had a relationship with Amir, loved him, wanted him permanently placed in her care, and that it was in the child's best interest to be with his family. The petition was summarily denied on May 1, 2014, on the grounds that it was incomplete, failed to state new evidence or a change of circumstances, and because the proposed change would not promote Amir's best interests.

Araceli filed a second section 388 petition on May 27, 2014, requesting that the court remove Amir from his foster placement. She argued that circumstances were "changed" because DCFS had "never assessed [her] as a relative caregiver for [Amir]" even though she had "live-scanned," had "no criminal history" and was "willing to adopt [her] nephew." Araceli requested that Amir be placed in her care and claimed the proposed modification was in the child's best interest because Amir's half-sister visited Araceli on weekends and wanted a relationship with Amir. Araceli also attached a May 8, 2014 notarized letter from mother—living in Belize—stating she wanted "Amir . . . to go to . . . Araceli," and that she was "giv[ing] Araceli . . . the right to get [her] son."

On May 30, 2014, the juvenile court summarily denied the petition as untimely, as the "legal preference for placement with relatives [was] no longer in

effect" because reunification services had been terminated, "the case [had been] set for a selection and implementation hearing," and because the proposed change would not promote Amir's best interest.

On June 30, 2014, Araceli filed a notice of appeal from the denial of her May 27, 2014 section 388 petition.

Parental rights were terminated on August 21, 2014.  (*Amir S.,* at pp. 11-12.)

## DISCUSSION

Araceli's 25-page opening brief contains numerous rambling, often unintelligible arguments and a mere four citations to the record.[5]  To the extent we can ascertain them, Araceli's arguments may be distilled to three principal contentions of error.  First, she argues that the juvenile court erred by disregarding the statutory preference for placing a dependent child in a relative's care by failing formally to notify her of her option to participate as a potential relative placement, and failing to consider her as a placement for Amir once she chose to come forward.  (§§ 309, subd. (e); 361.3, subd. (a).)  Second, Araceli maintains the court

---

[5]     Parties are required to support arguments in their briefs with appropriate reference to the record and proper citations to authority.  Noncompliance with this rule may, in our discretion, constitute waiver of their contentions.  (Cal. Rules of Court, rule 8.204(a)(1)(C), (e)(2)(C); *Osborn v. Hertz Corp.* (1988) 205 Cal.App.3d 703 [no coherent argument and no legal authorities]; *Berger v. Godden* (1985) 163 Cal.App.3d 1113, 1119 [failure to articulate intelligible legal argument in opening brief, at court's discretion, may be deemed an abandonment of the appeal justifying dismissal].)  We appreciate the difficulty involved in representing oneself in a dependency or appellate proceeding.  But self-representation does not exempt a litigant from the requirements of the law.  A litigant acting as her own counsel is due the same consideration as any party, but no more.  (*Harding v. Collazo* (1986) 177 Cal.App.3d 1044, 1056.)  Courts are not obliged to act as counsel for self-represented parties, though we should guard against inadvertence causing a miscarriage of justice.  (*Id.* at p. 1055.)  Accordingly, to the extent possible, we attempt to distill Araceli's assertions into cognizable appellate arguments.

violated section 361.3, subdivision (e), by failing to specify its reasons for denying her section 388 petition. Third, she contends the court erred in failing to find that DCFS abused its discretion by refusing to accept mother's voluntary relinquishment of Amir for adoption by Araceli. We conclude that none of these contentions has merit.

1.    *The Statutory Preference for Relative Placement*

Once a child is adjudged a dependent of the juvenile court, removed from his parents' physical custody, and placed under the agency's care, a DCFS social worker may place the child in any of several locations, including the approved home of a relative. (§ 361.2, subds. (e)(1)-(8).) Relatives who *request* placement of the dependent child are entitled to preferential consideration. (§ 361.3, subd. (a).)

"'Preferential consideration' means that the relative *seeking placement* shall be the first placement to be considered and investigated." (§ 361.3, subd. (c)(1), italics added.) Like Amir's maternal grandmother and aunt April, Araceli would have been eligible for preferential consideration as a relative placement had she requested to be considered. (§ 361.3, subd. (c)(2) [relatives entitled to consideration for preferential placement include adult grandparents or aunts].) The relative placement preference statute does not create an evidentiary presumption that such a placement is in the child's best interests. (*In re R.T.* (2015) 232 Cal.App.4th 1284, 1295 (*R.T.*).) Nor does it guarantee such a placement. (*In re Joseph T., Jr.* (2008) 163 Cal.App.4th 787, 798 (*Joseph T.*).) The preference simply places the requesting relative at the front of the line in deciding among available placements. (*R.T., supra,* 232 Cal.App.4th at pp. 1295–1296; § 361.3, subd. (c)(1) ["'Preferential consideration' means that the relative seeking placement shall be the first placement to be considered and investigated"].)

11

Although numerous factors must be taken into account in determining whether section 361.3's relative placement preference applies, the linchpin of the analysis is whether a relative placement is in the child's best interests.[6] (*In re Stephanie M.* (1994) 7 Cal.4th 295, 321 (*Stephanie M.*).)

The court's decision with regard to relative placement under section 361.3 requires an exercise of judicial discretion with regard to primarily factual matters. (*Alicia B. v. Superior Court* (2004) 116 Cal.App.4th 856, 863 (*Alicia B.*); *Stephanie M., supra,* 7 Cal.4th at p. 318.) We review a juvenile court's custody placement orders for abuse of discretion. (*Alicia B., supra,* 116 Cal.App.4th at p. 863.) The juvenile court "is given wide discretion and its determination will not be disturbed absent a manifest showing of abuse." (*Ibid.*)

---

[6] Factors considered by the court and social worker in determining whether to apply the relative placement preference include: "(1) The best interest of the child, including special physical, psychological, educational, medical, or emotional needs. [¶] (2) The wishes of the parent, the relative, and child, if appropriate. [¶] (3) [Certain] provisions of . . . the Family Code regarding relative placement. [¶] . . . [¶] (5) The good moral character of the relative and any other adult living in the home, including whether any individual residing in the home . . . has been responsible for acts of child abuse or neglect. [¶] (6) The nature and duration of the relationship between the child and the relative, and the relative's desire to care for, and to provide legal permanency for, the child if reunification is unsuccessful. [¶] (7) The ability of the relative to . . . : [¶] (A) Provide a safe, secure, and stable environment for the child. [¶] (B) Exercise proper and effective care and control of the child. [¶] (C) Provide a home and the necessities of life for the child. [¶] (D) Protect the child from his or her parents. [¶] (E) Facilitate court-ordered reunification efforts with the parents. [¶] (F) Facilitate visitation with the child's other relatives. [¶] (G) Facilitate implementation of all elements of the case plan. [¶] (H) Provide legal permanence for the child if reunification fails. [¶] . . . [¶] (8) The safety of the relative's home." (§ 361.3, subd. (a).)

a. *DCFS' Duty to Notify Araceli of the Option to Participate in Amir's Placement*

Araceli argues that DCFS failed in its duty to identify her as a potential relative placement and to advise her that she could participate in Amir's placement. She is mistaken. But, even if she were correct, DCFS' failure formally to notify Araceli was harmless.

Within 30 days of a child's removal, DCFS is required to use due diligence to investigate, identify and locate the child's adult relatives and, if appropriate, to provide those relatives written and, where appropriate, oral notification of the fact of the child's removal and of their option to participate in the child's care and placement. (§ 309, subds. (e)(1)(A), (B), (e)(3); Cal. Rules of Court, rule 5.637.)

Although the record does not bear out the first half of her claim, Araceli argues that mother identified her two sisters as possible relative placements for Amir at the outset, but DCFS never provided her written notification of her right to participate in the placement process. In fact, the record contains no evidence of a written advisement regarding the placement process to any relative. Nevertheless, there can be no doubt that, regardless of how she was informed, within days of DCFS' removal of Amir from parental custody, Araceli and other maternal relatives received oral notification of the child's removal, and participated in person in discussions with the CSW and court about the possibility of placing Amir either in the care of his maternal grandmother or aunt April. On this record, there can be no doubt that maternal aunt Araceli has been aware of and involved in events related to Amir's potential placements, including those with maternal relatives, at every stage of this action.

13

b.  *Harmless Error*

Even if DCFS failed formally to notify Araceli of her option to be considered as a relative placement, she has identified no harm suffered as a result of that failure.  The question before us is whether the juvenile court erred in denying Araceli's eleventh hour section 388 petition seeking to have Amir removed from his foster family and placed instead in her care.

Assuming, solely for the purpose of discussion, that the relative placement preference still applies at the penultimate stage of the dependency proceeding when the court is selecting the child's permanent plan, evidence that the court did not previously consider placing Amir with Araceli has no bearing on the question whether, *at the time Araceli's section 388 petition was filed*, such a placement was in Amir's best interest.  (See *Stephanie M., supra*, 7 Cal.4th at p. 322.)  Thus, DCFS' purported failure to provide formal notice under section 309, subdivision (e) was harmless.  Whether notice was properly given or whether a potential placement with Araceli was properly assessed in or around *January 2012*, is not relevant to the juvenile court's determination that Araceli's section 388 petition failed to make a prima facie showing that placing him in her care in *May 2014* was in the child's best interest.  (See *id*. at pp. 320, 322.)  Araceli knew long before May 2014 both that DCFS had determined that the maternal grandmother's home was not an appropriate placement, and that the agency had ongoing and significant concerns about the viability and wisdom of a placement with April.  Despite that knowledge, Araceli delayed almost two-and-one-half years before coming forward to request that she be considered as a placement.  On this record, there is no reason to believe she would have come forward earlier had she been formally notified of her options with regard to the dependency action.

14

2. *The Juvenile Court Did Not Abuse Its Discretion in Denying Araceli's Section 388 Petition Seeking Custody of Amir, nor Err in Failing to State its Reasons*

a. *Araceli Has Not Shown the Court Abused its Discretion by Denying her Section 388 Petition*

The statutory preference for relatives requesting placement continues throughout the reunification period. (*Joseph T., supra,* 163 Cal.App.4th at p. 795.) This is true even if the child is initially placed with a nonrelative, and whether or not a change of placement becomes necessary. (*Ibid.*)[7] However, once the court determines reunification is not feasible and the child should be freed for adoption, that preference disappears. (See *In re Lauren R.* (2007) 148 Cal.App.4th 841, 855 ["There is no relative placement preference for adoption"].) By that point in the process, the court's focus has shifted to the child's need for a permanent, stable home where he can develop a lasting emotional attachment to his caretakers. (*In re Marilyn H.* (1993) 5 Cal.4th 295, 309; *In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1342.)

---

[7] The rule's underlying purpose is twofold. First, so long as efforts at reunification remain ongoing, "relative caregivers are more likely to favor the goal of reunification and less likely than nonrelative caregivers to compete with the parents for permanent placement of the child." (*Joseph T.*, *supra*, 163 Cal.App.4th at p. 797.) Second, the statute aims to "assure[] interested relatives that, when a child is taken from [his] parents and placed outside the home pending the determination whether reunification is possible, the relative's application will be considered before a stranger's application. [Citation.]" (*In re Sarah S.* (1996) 43 Cal.App.4th 274, 285.)

15

A relative seeking placement of a dependent child after the reunification period has ended may file a section 388 petition.[8] (*Stephanie M., supra,* 7 Cal.4th at pp. 316-317; § 361.3, subd. (c)(2).) The juvenile court may change the child's placement if the relative can show new evidence or a material change of circumstances demonstrating that the requested change of placement is in the child's best interests. (*Id.* at p. 317; *In re Eric E.* (2006) 137 Cal.App.4th 252, 260.)

Our role on review is to determine if the juvenile court abused its discretion with respect to the order it made. (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351.) We do not ask if substantial evidence would have supported a different order, nor do we reweigh the evidence, substituting our judgment for that of the juvenile court. (*Stephanie M., supra,* 7 Cal.4th at p. 318.) As the moving party, it was Araceli's burden to present a prima facie showing of new evidence or changed circumstances such that removing Amir from his stable, long-term placement and placing him in her care was in the child's best interest. (*Id.* at p. 317; *In re M.V.* (2006) 146 Cal.App.4th 1048, 1059.)

Araceli failed to satisfy this burden. In her May 27, 2014 section 388 petition (the only one of her two petitions at issue), Araceli argued there were changed circumstances warranting removal of Amir from his foster placement because DCFS "never assessed [her] as a relative caregiver," and she had "no criminal history" and was "willing to adopt [her] nephew." She claimed the requested change of placement was in Amir's best interest because his half-sister

---

[8]     That statute provides that "[a]ny parent or other person having an interest in a child who is a dependent child of the juvenile court . . . may, upon grounds of change of circumstance or new evidence, petition . . . for a hearing to change, modify, or set aside any order of court . . . ."

16

visited on weekends and wanted to develop a relationship with Amir, and because mother wanted Amir placed in Araceli's care.

The juvenile court did not err in summarily denying Araceli's petition. The first step of a section 388 determination requires the petitioner to show there is new evidence or to demonstrate a genuine, significant and substantial change of circumstances. (*In re Kimberly F.* (1997) 56 Cal.App.4th 519, 529.) Except for her belated claim that she was now willing to adopt the child, Araceli's section 388 petition contained no new evidence. Nor did it demonstrate any changed circumstance that might warrant Amir's re-placement.

Further, the petition did not make a prima facie showing that the requested change of placement would serve Amir's best interests, as opposed to his relative's interests. After reunification services have terminated, the court's focus shifts. The child's interest in stability becomes paramount, and a court considering a motion seeking a change of placement must bear this shift in mind in determining whether a change of placement is in the child's best interest. (*Stephanie M, supra,* 7 Cal.4th at p. 317.) The court errs if it accords too much weight "to [a relative's] interest in maintaining a family tie with the child . . . ." (*Id*. at p. 324.) At this stage in the proceedings, "on [a] motion for change of placement, the burden [is] on the moving part[y] to show that the change [is] in the best interests of the child *at that time*. Evidence that at earlier proceedings the court [did] not sufficiently consider[] placement with the [relative is] not relevant to establish that at the time of the hearing under review, placement with the [relative is] in the child's best interests." (*Id*. at p. 322.)

Here, the court's focus was properly on Amir's best interests, which it found best served by having him remain with the family with which he has lived most of his life, the only stable family he has ever known, the family that committed to adopting him, and the family members with whom he has forged strong and loving

attachments.  (See *Stephanie M, supra,* 7 Cal.4th at pp. 323–324.)  That determination was not an abuse of discretion.  (*Id*. at pp. 318–319.)

### b.    *The Court Satisfied Section 361.3, Subdivision (e)*

Araceli also contends that the juvenile court violated section 361.3, subdivision (e), by failing to state on the record its reasons for denying her petition.  She is mistaken.  The record reflects that the court denied Araceli's petition on the ground that it was untimely, because the "legal preference for placement with relatives [was] no longer in effect" once reunification services had been terminated and "the case [had been] set for a selection and implementation hearing" to select a permanent plan (§ 366.26).

### 3.    *The Juvenile Court did not err by Failing to Determine Whether DCFS Abused its Discretion by Refusing to Accept Mother's Voluntary Relinquishment of Amir for Adoption*

Araceli's final assertion is that DCFS and the juvenile court should have given effect to mother's stated desire voluntarily to relinquish Amir for adoption by Araceli.  We disagree.

Parents may voluntarily relinquish parental rights and responsibilities and consent to adoption of a child by a private or public (such as DCFS) adoption agency.  (See generally Fam. Code, § 8700; § 361, subds. (b)(1)-(3).)  The Legislature strongly encourages adoption by relatives of children who cannot return to their parents and are in or at risk of entering the dependency system. (Fam. Code, § 8714.5, subds. (a)(1), (2).)  There are, however, certain requirements which must be met and procedures with which parents must comply before relinquishment is effective.  Those requirements were not satisfied here, nor were appropriate procedures employed.

18

First, Araceli asserts that *both* of Amir's parents sought to relinquish their son for adoption, but DCFS refused to accept their relinquishment. However, nothing in the record shows that Amir's father chose to relinquish his parental rights. Indeed, the fact that Amir's father vigorously opposed termination of his parental rights is evident from our discussion in father's appeal from that order in *Amir S., supra*.

Second, even if mother had had the power unilaterally to relinquish Amir for adoption (she did not), her ambiguous handwritten letter stating that she wished Amir to "*go* to" Araceli and that she wanted to "*give* Araceli the right to *get* [her] son," (italics added) fell short of the statutory requirements to effect relinquishment of parental rights. (Fam. Code, § 8700, subds. (c), (d).)[9]

Finally, Araceli contends that DCFS rejected "the designated relinquishment because honoring the *parents'* choice of adoptive parents would entail moving

---

[9] Those subdivisions require that: "(c) If a parent resides outside this state *and the other parent has relinquished the child for adoption* . . . , the parent residing out of state may relinquish the child by a written statement signed before a notary on a form prescribed by the department, and previously signed by an authorized official . . . that signifies the willingness of the department, county adoption agency, or licensed adoption agency to accept the relinquishment.

"(d) If a parent and child reside outside this state *and the other parent has not relinquished the child for adoption* to the department, county adoption agency, or licensed adoption agency, the parent residing out of state may relinquish the child to the department, county adoption agency, or licensed adoption agency by a written statement signed by the relinquishing parent, *after* the following requirements have been satisfied:

"(1) Prior to signing the relinquishment, the relinquishing parent shall have received . . . the same counseling and advisement services as if the relinquishing parent resided in this state.

"(2) The relinquishment shall be signed before a representative of an agency licensed or otherwise approved to provide adoption services under the laws of the relinquishing parent's state of residence whenever possible or before a licensed social worker on a form prescribed by the department, and previously signed by an authorized official . . . that signifies the willingness of the department, county adoption agency, or licensed adoption agency to accept the relinquishment." (Italics added.)

19

[Amir] 'to a place he never lived before.'" (Italics added.) She argues that DCFS failed to consider other significant factors, such as Amir's age, the amount of time he had spent with his foster caregiver (including a caregiver who wishes to adopt him), and the benefits and detriments of adoption by Araceli, in light of her "personal characteristics, financial stability, and 'commitment and capability to meet the needs' of the child. [Citation.]"

To the extent the factors cited by Araceli might have been relevant, each factor militates strongly in favor of maintaining Amir in his current stable placement. At the time Araceli's section 388 petition was filed, Amir was two-and-one-half years old, and had lived with the caregiver who now wished to adopt him for most of his life. The record contains no information about Araceli's financial stability or her ability to meet Amir's needs. As for her personal characteristics and long-term commitment to meeting her nephew's needs, to the extent the record contains any information, there is evidence that Araceli cares for Amir and wants to provide him a home. However, she delayed far too long in attempting to fulfill a parental role.

On this record we agree that Amir's best interests are served by permitting him to remain in his current placement.

*//*

*//*

*//*

*//*

*//*

*//*

*//*

*//*

20

## DISPOSITION

The order is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**



WILLHITE, J.



We concur:



EPSTEIN, P. J.



MANELLA, J.

21